# BROWN SHOE CO., INC., *v.* UNITED STATES.

No. 4. Argued December 6, 1961.—Decided June 25, 1962.

*Arthur H. Dean* argued the cause for appellant. With him on the briefs were *Robert H. McRoberts, Henry N. Ess III* and *Dennis C. Mahoney.*

*Solicitor General Cox* argued the cause for the United States. With him on the brief were *Assistant Attorney General Loevinger, J. William Doolittle, Richard A. Solomon, Philip Marcus* and *James J. Coyle.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

I.

This suit was initiated in November 1955 when the Government filed a civil action in the United States District Court for the Eastern District of Missouri alleging that a contemplated merger between the G. R. Kinney Company, Inc. (Kinney), and the Brown Shoe Company, Inc. (Brown), through an exchange of Kinney for Brown stock, would violate § 7 of the Clayton Act, 15 U. S. C. § 18. The Act, as amended, provides in pertinent part:

> "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital . . . of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

The complaint sought injunctive relief under § 15 of the Clayton Act, 15 U. S. C. § 25, to restrain consummation of the merger.

A motion by the Government for a preliminary injunction *pendente lite* was denied, and the companies were permitted to merge provided, however, that their businesses be operated separately and that their assets be kept separately identifiable. The merger was then effected on May 1, 1956.

In the District Court, the Government contended that the effect of the merger of Brown—the third largest seller of shoes by dollar volume in the United States, a leading manufacturer of men's, women's, and children's shoes, and a retailer with over 1,230 owned, operated or controlled retail outlets [1]—and Kinney—the eighth largest company, by dollar volume, among those primarily engaged in selling shoes, itself a large manufacturer of shoes, and a retailer with over 350 retail outlets—"may be substantially to lessen competition or to tend to create a monopoly" by eliminating actual or potential competition in the production of shoes for the national wholesale shoe market and in the sale of shoes at retail in the Nation, by foreclosing competition from "a market represented by Kinney's retail outlets whose annual sales exceed $42,000,000," and by enhancing Brown's competitive advantage over other producers, distributors and sellers of shoes. The Government argued that the "line of commerce" affected by this merger is "footwear," or alternatively, that the "line[s]" are "men's," "women's," and "children's" shoes, separately considered, and that the "section of the country," within which the anticompetitive effect of the merger is to be judged, is the Nation as a whole, or alternatively, each separate city or city and its

---

[1] Of these over 1,230 outlets under Brown's control at the time of the filing of the complaint, Brown owned and operated over 470, while over 570 were independently owned stores operating under the Brown "Franchise Program" and over 190 were independently owned outlets operating under the "Wohl Plan." A store operating under the Franchise Program agrees not to carry competing lines of shoes of other manufacturers in return for certain aid from Brown; a store under the Wohl Plan similarly agrees to concentrate its purchases on lines which Brown sells through Wohl in return for credit and merchandising aid. See note 66, infra. In addition, Brown shoes were sold through numerous retailers operating entirely independently of Brown.

immediate surrounding area in which the parties sell shoes at retail.

In the District Court, Brown contended that the merger would be shown not to endanger competition if the "line[s] of commerce" and the "section[s] of the country" were properly determined. Brown urged that not only were the age and sex of the intended customers to be considered in determining the relevant line of commerce, but that differences in grade of material, quality of workmanship, price, and customer use of shoes resulted in establishing different lines of commerce. While agreeing with the Government that, with regard to manufacturing, the relevant geographic market for assessing the effect of the merger upon competition is the country as a whole, Brown contended that with regard to retailing, the market must vary with economic reality from the central business district of a large city to a "standard metropolitan area" [2] for a smaller community. Brown further contended that, both at the manufacturing level and at the retail level, the shoe industry enjoyed healthy competition and that the vigor of this competition would not, in any event, be diminished by the proposed merger because Kinney manufactured less than 0.5% and retailed less than 2% of the Nation's shoes.

The District Court rejected the broadest contentions of both parties. The District Court found that "there is one group of classifications which is understood and recog-

---

[2] "The general concept adopted in defining a standard metropolitan area [is] that of an integrated economic area with a large volume of daily travel and communication between a central city of 50,000 inhabitants or more and the outlying parts of the area. . . . Each area (except in New England) consists of one or more entire counties. In New England, metropolitan areas have been defined on a town basis rather than a county basis." II U. S. Bureau of the Census, United States Census of Business: 1954, p. 3.

nized by the entire industry and the public—the classification into 'men's,' 'women's' and 'children's' shoes separately and independently." On the other hand, "[t]o classify shoes as a whole could be unfair and unjust; to classify them further would be impractical, unwarranted and unrealistic."

Realizing that "the areas of effective competition for retailing purposes cannot be fixed with mathematical precision," the District Court found that "when determined by economic reality, for retailing, a 'section of the country' is a city of 10,000 or more population and its immediate and contiguous surrounding area, regardless of name designation, and in which a Kinney store and a Brown (operated, franchise, or plan) [3] store are located."

The District Court rejected the Government's contention that the combining of the manufacturing facilities of Brown and Kinney would substantially lessen competition in the production of men's, women's, or children's shoes for the national wholesale market. However, the District Court did find that the likely foreclosure of other manufacturers from the market represented by Kinney's retail outlets may substantially lessen competition in the manufacturers' distribution of "men's," "women's," and "children's" shoes, considered separately, throughout the Nation. The District Court also found that the merger may substantially lessen competition in retailing alone in "men's," "women's," and "children's" shoes, considered separately, in every city of 10,000 or more population and its immediate surrounding area in which both a Kinney and a Brown store are located.

Brown's contentions here differ only slightly from those made before the District Court. In order fully to understand and appraise these assertions, it is necessary to set

---

[3] See note 1, *supra.*

out in some detail the District Court's findings concerning the nature of the shoe industry and the place of Brown and Kinney within that industry.

*The Industry.*

The District Court found that although domestic shoe production was scattered among a large number of manufacturers, a small number of large companies occupied a commanding position. Thus, while the 24 largest manufacturers produced about 35% of the Nation's shoes, the top 4—International, Endicott-Johnson, Brown (including Kinney) and General Shoe—alone produced approximately 23% of the Nation's shoes or 65% of the production of the top 24.

In 1955, domestic production of nonrubber shoes was 509.2 million pairs, of which about 103.6 million pairs were men's shoes, about 271 million pairs were women's shoes, and about 134.6 million pairs were children's shoes.[4] The District Court found that men's, women's, and children's shoes are normally produced in separate factories.

The public buys these shoes through about 70,000 retail outlets, only 22,000 of which, however, derive 50% or more of their gross receipts from the sale of shoes and are classified as "shoe stores" by the Census Bureau.[5] These

---

[4] U. S. Bureau of Census, Facts for Industry, Production, by Kind of Footwear: 1956 and 1955, Table 1, Production Series M31A–06, introduced as Defendant's Exhibit MM. The term "nonrubber shoes" includes leather shoes, sandals and play shoes, but excludes canvas-upper, rubber-soled shoes, athletic shoes and slippers. *Ibid.*

[5] These figures are based on the 1954 Census of Business. For that enumeration, the Census Bureau classification "shoe stores" included separately operated leased shoe departments of general stores, as distinguished from the shoe departments of general stores operated only as sections of the latter's general business. U. S. Bureau of Census, Retail Trade, Single Units and Multiunits, BC58–RS3, p. I. As described, *infra,* Brown operated numerous leased shoe departments in general stores which would be included in the Census Bureau's total of "shoe stores."

22,000 shoe stores were found generally to sell (1) men's shoes only, (2) women's shoes only, (3) women's and children's shoes, or (4) men's, women's, and children's shoes.

The District Court found a "definite trend" among shoe manufacturers to acquire retail outlets. For example, International Shoe Company had no retail outlets in 1945, but by 1956 had acquired 130; General Shoe Company had only 80 retail outlets in 1945 but had 526 by 1956; Shoe Corporation of America, in the same period, increased its retail holdings from 301 to 842; Melville Shoe Company from 536 to 947; and Endicott-Johnson from 488 to 540. Brown, itself, with no retail outlets of its own prior to 1951, had acquired 845 such outlets by 1956. Moreover, between 1950 and 1956 nine independent shoe store chains, operating 1,114 retail shoe stores, were found to have become subsidiaries of these large firms and to have ceased their independent operations.

And once the manufacturers acquired retail outlets, the District Court found there was a "definite trend" for the parent-manufacturers to supply an ever increasing percentage of the retail outlets' needs, thereby foreclosing other manufacturers from effectively competing for the retail accounts. Manufacturer-dominated stores were found to be "drying up" the available outlets for independent producers.

Another "definite trend" found to exist in the shoe industry was a decrease in the number of plants manufacturing shoes. And there appears to have been a concomitant decrease in the number of firms manufacturing shoes. In 1947, there were 1,077 independent manufacturers of shoes, but by 1954 their number had decreased about 10% to 970.[6]

---

[6] U. S. Bureau of the Census, 1958 Census of Manufacturers, MC 58(2)-31A-6. By 1958, the number of independent manufacturers had decreased by another 10% to 872. *Ibid.*

*Brown Shoe.*

Brown Shoe was found not only to have been a participant, but also a moving factor, in these industry trends. Although Brown had experimented several times with operating its own retail outlets, by 1945 it had disposed of them all. However, in 1951, Brown again began to seek retail outlets by acquiring the Nation's largest operator of leased shoe departments, Wohl Shoe Company (Wohl), which operated 250 shoe departments in department stores throughout the United States. Between 1952 and 1955 Brown made a number of smaller acquisitions: Wetherby-Kayser Shoe Company (three retail stores), Barnes & Company (two stores), Reilly Shoe Company (two leased shoe departments), Richardson Shoe Store (one store), and Wohl Shoe Company of Dallas (not connected with Wohl) (leased shoe departments in Dallas). In 1954, Brown made another major acquisition: Regal Shoe Corporation which, at the time, operated one manufacturing plant producing men's shoes and 110 retail outlets.

The acquisition of these corporations was found to lead to increased sales by Brown to the acquired companies. Thus although prior to Brown's acquisition of Wohl in 1951, Wohl bought from Brown only 12.8% of its total purchases of shoes, it subsequently increased its purchases to 21.4% in 1952 and to 32.6% in 1955. Wetherby-Kayser's purchases from Brown increased from 10.4% before acquisition to over 50% after. Regal, which had previously sold no shoes to Wohl and shoes worth only $89,000 to Brown, in 1956 sold shoes worth $265,000 to Wohl and $744,000 to Brown.

During the same period of time, Brown also acquired the stock or assets of seven companies engaged solely in shoe manufacturing. As a result, in 1955, Brown was the

fourth largest shoe manufacturer in the country, producing about 25.6 million pairs of shoes or about 4% of the Nation's total footwear production.

*Kinney.*

Kinney is principally engaged in operating the largest family-style shoe store chain in the United States. At the time of trial, Kinney was found to be operating over 400 such stores in more than 270 cities. These stores were found to make about 1.2% of all national retail shoe sales by dollar volume. Moreover, in 1955 the Kinney stores sold approximately 8 million pairs of nonrubber shoes or about 1.6% of the national pairage sales of such shoes. Of these sales, approximately 1.1 million pairs were of men's shoes or about 1% of the national pairage sales of men's shoes; approximately 4.2 million pairs were of women's shoes or about 1.5% of the national pairage sales of women's shoes; and approximately 2.7 million pairs were of children's shoes or about 2% of the national pairage sales of children's shoes.[7]

In addition to this extensive retail activity, Kinney owned and operated four plants which manufactured men's, women's, and children's shoes and whose combined output was 0.5% of the national shoe production in 1955, making Kinney the twelfth largest shoe manufacturer in the United States.

Kinney stores were found to obtain about 20% of their shoes from Kinney's own manufacturing plants. At the time of the merger, Kinney bought no shoes from Brown;

---

[7] Kinney's pairage sales of men's, women's, and children's shoes were extracted from exhibits submitted to the Government in response to its interrogatories. See GX 6, R. 48–53. These statistics are virtually identical to those cited in appellant's brief, with but one exception. In its internal operations, appellant classifies certain shoes as "growing girls'" shoes while the cited figures follow the Census Bureau's treatment of such shoes as "women's" shoes.

however, in line with Brown's conceded reasons [8] for acquiring Kinney, Brown had, by 1957, become the largest outside supplier of Kinney's shoes, supplying 7.9% of all Kinney's needs.

It is in this setting that the merger was considered and held to violate § 7 of the Clayton Act. The District Court ordered Brown to divest itself completely of all stock, share capital, assets or other interests it held in Kinney, to operate Kinney to the greatest degree possible as an independent concern pending complete divestiture, to refrain thereafter from acquiring or having any interest in Kinney's business or assets, and to file with the court within 90 days a plan for carrying into effect the divestiture decreed. The District Court also stated it would retain jurisdiction over the cause to enable the parties to apply for such further relief as might be necessary to enforce and apply the judgment. Prior to its submission of a divestiture plan, Brown filed a notice of appeal in the District Court. It then filed a jurisdictional statement in this Court, seeking review of the judgment below as entered.

## II.

### JURISDICTION.

Appellant's jurisdictional statement cites as the basis of our jurisdiction over this appeal § 2 of the Expediting

---

[8] As stated in the testimony of Clark R. Gamble, President of Brown Shoe Company:

"It was our feeling, in addition to getting a distribution into the field of prices which we were not covering, it was also the feeling that as Kinney moved into the shopping centers in these free standing stores, they were going into a higher income neighborhood and they would probably find the necessity of up-grading and adding additional lines to their very successful operation that they had been doing and it would give us an opportunity we hoped to be able to sell them in that category. Besides that, it was a very successful operation and would give us a good diversified investment to stabilize our earnings." T. 1323.

Act of February 11, 1903, 32 Stat. 823, as amended, 15 U. S. C. § 29. In a civil antitrust action in which the United States is the complainant that Act provides for a direct appeal to this Court from "the *final* judgment of the district court."[9] (Emphasis supplied.) The Government does not contest appellant's claim of jurisdiction; on the contrary, it moved to have the judgment below summarily affirmed, conceding our present jurisdiction to review the merits of that judgment. We deferred ruling on the Government's motion for summary affirmance and noted probable jurisdiction over the appeal. 363 U. S. 825.[10]

It was suggested from the bench during the oral argument that, since the judgment of the District Court does not include a specific plan for the dissolution of the Brown-Kinney merger, but reserves such a ruling pending the filing of suggested plans for implementing divestiture, the judgment below is not "final" as contemplated by the Expediting Act. In response to that suggestion, both parties have filed briefs contending that we do have jurisdiction to dispose of the case on the merits in its present posture. However, the mere consent of the parties to the Court's consideration and decision of the case cannot, by itself, confer jurisdiction on the Court. See *American Fire & Casualty Co.* v. *Finn,* 341 U. S. 6, 17–18; *People's Bank* v. *Calhoun,* 102 U. S. 256, 260–261; *Capron* v. *Van Noorden,* 2 Cranch 126, 127. Therefore, a review of the sources of the Court's jurisdiction is a threshold

---

[9] Congress thus limited the right of review in such cases to an appeal from a decree which disposed of all matters, and it precluded the possibility of an appeal either to this Court or to a Court of Appeals from an interlocutory decree. *United States* v. *California Cooperative Canneries,* 279 U. S. 553, 558.

[10] After probable jurisdiction had been noted, a joint motion of the parties to postpone oral argument on the appeal to the present Term of the Court was granted. 365 U. S. 825.

inquiry appropriate to the disposition of every case that comes before us. Revised Rules of the Supreme Court, 15 (1)(b), 23 (1)(b); *Kesler* v. *Department of Public Safety,* 369 U. S. 153; *Collins* v. *Miller,* 252 U. S. 364; *United States* v. *More,* 3 Cranch 159.

The requirement that a final judgment shall have been entered in a case by a lower court before a right of appeal attaches has an ancient history in federal practice, first appearing in the Judiciary Act of 1789.[11] With occasional modifications, the requirement has remained a cornerstone of the structure of appeals in the federal courts.[12] The Court has adopted essentially practical tests for identifying those judgments which are, and those which are not, to be considered "final." See, *e. g., Cobbledick* v. *United States,* 309 U. S. 323, 326; *Market Street R. Co.* v. *Railroad Comm'n,* 324 U. S. 548, 552; *Republic Natural Gas Co.* v. *Oklahoma,* 334 U. S. 62, 69; *Cohen* v. *Beneficial Industrial Loan Corp.,* 337 U. S. 541, 546; *DiBella* v. *United States,* 369 U. S. 121, 124, 129; cf. *Federal Trade Comm'n* v. *Minneapolis-Honeywell Regulator Co.,* 344 U. S. 206, 212; *United States* v. *Schaefer Brewing Co.,* 356 U. S. 227, 232. A pragmatic approach to the question of finality has been considered essential to the achievement of the "just, speedy, and inexpensive determination of every action":[13] the touchstones of federal procedure.

In most cases in which the Expediting Act has been cited as the basis of this Court's jurisdiction, the issue of "finality" has not been raised or discussed by the parties or the Court. On but few occasions have particular

---

[11] Section 22, 1 Stat. 84, in its present form, 28 U. S. C. § 1291.

[12] Cf. 28 U. S. C. § 1292; Fed. Rules Civ. Proc., 54 (b); 28 U. S. C. § 1651; *Ex parte United States,* 226 U. S. 420; *United States* v. *United States District Court,* 334 U. S. 258; *Beacon Theatres, Inc.,* v. *Westover,* 359 U. S. 500.

[13] Fed. Rules Civ. Proc., 1.

orders in suits to which that Act is applicable been considered in the light of claims that they were insufficiently "final" so as to preclude appeal to this Court. Compare *Schine Chain Theatres* v. *United States*, 329 U. S. 686, with *Schine Chain Theatres* v. *United States*, 334 U. S. 110. The question has generally been passed over without comment in adjudications on the merits. While we are not bound by previous exercises of jurisdiction in cases in which our power to act was not questioned but was passed *sub silentio*, *United States* v. *Tucker Truck Lines*, 344 U. S. 33, 38; *United States ex rel. Arant* v. *Lane*, 245 U. S. 166, 170, neither should we disregard the implications of an exercise of judicial authority assumed to be proper for over 40 years.[14] Cf. *Stainback* v. *Mo*

---

[14] See, *e. g.*, *United States* v. *Reading Co.*, 226 F. 229, 286 (D. C. E. D. Pa.), 1 Decrees & Judgments in Civil Federal Antitrust Cases (hereinafter cited "D. & J.") 575, 576–577, affirmed in pertinent part, 253 U. S. 26; *United States* v. *National Lead Co.*, 63 F. Supp. 513, 534–535 (D. C. S. D. N. Y.), 4 D. & J. 2846, 2851, affirmed, 332 U. S. 319; *United States* v. *Timken Roller Bearing Co.*, 83 F. Supp. 284, 318 (D. C. N. D. Ohio) [relevant portions of the decree reprinted at 341 U. S. 593, 602 n. 1], modified, 341 U. S. 593; *United States* v. *United Shoe Machinery Corp.*, 110 F. Supp. 295, 352–353, 354 (D. C. D. Mass.), affirmed, 347 U. S. 521; *United States* v. *Maryland & Virginia Milk Producers Assn.*, 167 F. Supp. 799, 809 (D. C. D. C.), affirmed, 362 U. S. 458. The Court has also approved the practice of District Courts of retaining jurisdiction in such cases for future modifications of their decrees, a practice which has also not been considered inconsistent with the finality of the original decrees. See *Associated Press* v. *United States*, 326 U. S. 1, 22–23; *Lorain Journal Co.* v. *United States*, 342 U. S. 143, 157. But cf. *United States* v. *Schine Chain Theatres*, 63 F. Supp. 229, 241–242 (D. C. W. D. N. Y.), 2 D. & J. 1815, modified, 334 U. S. 110; *United States* v. *Paramount Pictures*, 70 F. Supp. 53, 72, 75 (D. C. S. D. N. Y.), 2 D. & J. 1682, modified, 334 U. S. 131, revised in accordance with this Court's mandate, 85 F. Supp. 881, 898–901, 2 D. & J. 1690, affirmed *sub nom. Loew's, Inc.*, v. *United States*, 339 U. S. 974, in which review did await the entry of specific and detailed provisions for disposition of the defendants' assets.

*Hock Ke Lok Po,* 336 U. S. 368, 379–380; *Radio Station WOW* v. *Johnson,* 326 U. S. 120, 125–126.

We think the decree of the District Court in this case had sufficient indicia of finality for us to hold that the judgment is properly appealable at this time. We note, first, that the District Court disposed of the entire complaint filed by the Government. Every prayer for relief was passed upon. Full divestiture by Brown of Kinney's stock and assets was expressly required. Appellant was permanently enjoined from acquiring or having any further interest in the business, stock or assets of the other defendant in the suit. The single provision of the judgment by which its finality may be questioned is the one requiring appellant to propose in the immediate future a plan for carrying into effect the court's order of divestiture. However, when we reach the merits of, and affirm, the judgment below, the sole remaining task for the District Court will be its acceptance of a plan for full divestiture, and the supervision of the plan so accepted. Further rulings of the District Court in administering its decree, facilitated by the fact that the defendants below have been required to maintain separate books *pendente lite,* are sufficiently independent of, and subordinate to, the issues presented by this appeal to make the case in its present posture a proper one for review now.[15] Appellant here does not attack the full divestiture ordered by the District Court as such; it is appellant's contention that

---

[15] Cf. *Forgay* v. *Conrad,* 6 How. 201; *Carondelet Canal Co.* v. *Louisiana,* 233 U. S. 362; *Radio Station WOW* v. *Johnson,* 326 U. S. 120; *Cohen* v. *Beneficial Industrial Loan Corp.,* 337 U. S. 541. The details of the divestiture which the District Court will approve cannot affect the outcome of the basic litigation in this case, as the details of an eminent domain settlement might moot the claims of the condemnee in that type of suit. See *Republic Natural Gas Co.* v. *Oklahoma,* 334 U. S. 62; *Grays Harbor Logging Co.* v. *Coats-Fordney Co.,* 243 U. S. 251.

under the facts of the case, as alleged and proved by the Government, *no* order of divestiture could have been proper. The propriety of divestiture was considered below and is disputed here on an "all or nothing" basis. It is ripe for review now, and will, thereafter, be foreclosed. Repetitive judicial consideration of the same question in a single suit will not occur here. Cf. *Radio Station WOW* v. *Johnson, supra,* at 127; *Catlin* v. *United States,* 324 U. S. 229, 233–234; *Cobbledick* v. *United States, supra,* at 325, 330.

A second consideration supporting our view is the character of the decree still to be entered in this suit. It will be an order of full divestiture. Such an order requires careful, and often extended, negotiation and formulation. This process does not take place in a vacuum, but, rather, in a changing market place, in which buyers and bankers must be found to accomplish the order of forced sale. The unsettling influence of uncertainty as to the affirmance of the initial, underlying decision compelling divestiture would only make still more difficult the task of assuring expeditious enforcement of the antitrust laws. The delay in withholding review of any of the issues in the case until the details of a divestiture had been approved by the District Court and reviewed here could well mean a change in market conditions sufficiently pronounced to render impractical or otherwise unenforceable the very plan of asset disposition for which the litigation was held. The public interest, as well as that of the parties, would lose by such procedure.

Lastly, holding the decree of the District Court in the instant case less than "final" and, thus, not appealable, would require a departure from a settled course of the Court's practice. It has consistently reviewed antitrust decrees contemplating either future divestiture or other comparable remedial action prior to the formulation and

entry of the precise details of the relief ordered. No instance has been found in which the Court has reviewed a case following a divestiture decree such as the one we are asked to consider here, in which the party subject to that decree has later brought the case back to this Court with claims of error in the details of the divestiture finally approved.[16] And only two years ago, we were unanimous in accepting jurisdiction, and in affirming the judgment of a District Court similar to the one entered here, in the only case under amended § 7 of the Clayton Act brought before us at a juncture comparable to the instant litigation. See *Maryland & Virginia Milk Producers Assn.* v. *United States*, 362 U. S. 458, 472–473.[17] A fear of piecemeal appeals because of our adherence to existing procedure can find no support in history. Thus, the substantial body

---

[16] The Court has, of course, occasionally reviewed varying facets of single antitrust cases on separate appeals. However, such cases are distinguishable from the situation at bar. Thus, one group includes cases in which the Government first sought appellate review from dismissals of its complaints, whereafter the Court considered the orders entered on remand. *E. g., United States* v. *Terminal R. Assn. of St. Louis*, 224 U. S. 383; 236 U. S. 194; *United States* v. *E. I. du Pont de Nemours & Co.*, 353 U. S. 586; 366 U. S. 316. Another group includes cases in which the Government appealed from what it considered to be inadequate decrees, in which the Court later considered the further relief ordered on remand. *E. g., United States* v. *Reading Co.*, 253 U. S. 26, later considered *sub nom. Continental Insurance Co.* v. *United States*, 259 U. S. 156; *United States* v. *Paramount Pictures*, 334 U. S. 131, later considered *sub nom. Loew's, Inc.*, v. *United States*, 339 U. S. 974. And appeals in which the details of a divestiture were made a primary issue have followed the entry of such orders upon the filing of consent decrees, in which the underlying requirements of divestiture were never previously presented. *E. g., Swift & Co.* v. *United States*, 276 U. S. 311; *United States* v. *Swift & Co.*, 286 U. S. 106; *Chrysler Corp.* v. *United States*, 316 U. S. 556; *Ford Motor Co.* v. *United States*, 335 U. S. 303. Cf. *International Harvester Co.* v. *United States*, 248 U. S. 587; 274 U. S. 693.

[17] Cf. *Jerrold Electronics Corp.* v. *United States*, 365 U. S. 567, affirming 187 F. Supp. 545, 563–567 (D. C. E. D. Pa.).

of precedent for accepting jurisdiction over this case in its present posture supports the practical considerations previously discussed. We believe a contrary result would be inconsistent with the very purposes for which the Expediting Act was passed and that gave it its name.

## III.

### LEGISLATIVE HISTORY.

This case is one of the first to come before us in which the Government's complaint is based upon allegations that the appellant has violated § 7 of the Clayton Act, as that section was amended in 1950.[18] The amendments adopted in 1950 culminated extensive efforts over a number of years, on the parts of both the Federal Trade Commission and some members of Congress, to secure revision of a section of the antitrust laws considered by many observers to be ineffective in its then existing form. Sixteen bills to amend § 7 during the period 1943 to 1949

---

[18] Material in italics was added by the amendments; material in brackets was deleted. "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital *and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets* of another corporation engaged also in commerce, where *in any line of commerce in any section of the country,* the effect of such acquisition may be [to] substantially *to* lessen competition [between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain such commerce in any section or community], or *to* tend to create a monopoly [of any line of commerce]." Other paragraphs of § 7 were also amended in details not relevant to this case. The only other cases to reach this Court, in which the Government's complaints were based, in part, on amended § 7, were *Maryland & Virginia Milk Producers Assn.* v. *United States,* 362 U. S. 458, and *Jerrold Electronics Corp.* v. *United States,* 365 U. S. 567. However, a detailed analysis of the scope and purposes of the 1950 amendments was unnecessary to our disposition of the issues raised in those cases.

alone were introduced for consideration by the Congress, and full public hearings on proposed amendments were held in three separate sessions.[19] In the light of this extensive legislative attention to the measure, and the broad, general language finally selected by Congress for the expression of its will, we think it appropriate to review the history of the amended Act in determining whether the judgment of the court below was consistent with the intent of the legislature. See *United States v. E. I. du Pont de Nemours & Co.*, 353 U. S. 586, 591–592; *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U. S. 384, 390–395; *Federal Trade Comm'n v. Morton Salt Co.*, 334 U. S. 37, 43–46, 49; *Corn Products Refining Co. v. Federal Trade Comm'n*, 324 U. S. 726, 734–737.

As enacted in 1914, § 7 of the original Clayton Act prohibited the acquisition by one corporation of the *stock* of another corporation when such acquisition would result in a substantial lessening of competition *between the acquiring and the acquired* companies, or tend to

---

[19] S. 2277, 67th Cong., 1st Sess. (1921); H. R. 7371, S. 2549, 75th Cong., 1st Sess. (1937); H. R. 10176, S. 3345, 75th Cong., 2d Sess. (1938); H. R. 1517, S. 577, 78th Cong., 1st Sess. (1943); H. R. 2357, H. R. 4519, H. R. 4810, S. 615, 79th Cong., 1st Sess. (1945); H. R. 5535, 79th Cong., 2d Sess. (1946); H. R. 515, H. R. 3736, S. 104, 80th Cong., 1st Sess. (1947); H. R. 7024, 80th Cong., 2d Sess. (1948); H. R. 988, H. R. 1240, H. R. 2006, H. R. 2734, S. 56, 81st Cong., 1st Sess. (1949).

Public hearings were held on H. R. 2357, 79th Cong., 1st Sess. (1945); S. 104, 80th Cong., 1st Sess. (1947); H. R. 515, 80th Cong., 1st Sess. (1947), and H. R. 2734, 81st Cong., 1st Sess. (1949–1950).

For reviews of the legislative history of the amendments, see Notes, 52 Col. L. Rev. 766 (1952); 46 Ill. L. Rev. 444 (1951); Bok, Section 7 of the Clayton Act and the Merging of Law and Economics, 74 Harv. L. Rev. 226, 233–238 (1960); Handler and Robinson, A Decade of Administration of the Celler-Kefauver Antimerger Act, 61 Col. L. Rev. 629, 652–674 (1961); Martin, Mergers and the Clayton Act 221–310 (1959).

create a monopoly in any line of commerce. The Act did not, by its explicit terms, or as construed by this Court, bar the acquisition by one corporation of the *assets* of another.[20] Nor did it appear to preclude the acquisition of stock in any corporation other than a direct competitor.[21] Although proponents of the 1950 amendments to the Act suggested that the terminology employed in these provisions was the result of accident or an unawareness that the acquisition of assets could be as inimical to competition as stock acquisition, a review of the legislative history of the original Clayton Act fails to support such views.[22] The possibility of asset acquisition was discussed,[23] but was not considered impor-

---

[20] See *Arrow-Hart & Hegeman Electric Co.* v. *Federal Trade Comm'n*, 291 U. S. 587; *Federal Trade Comm'n* v. *Western Meat Co.,* 272 U. S. 554. See also *United States* v. *Celanese Corp.*, 91 F. Supp. 14 (D. C. S. D. N. Y.); 1 F. T. C. 541–542; 33 Op. Atty. Gen. 225, 241.

[21] This was the manner in which the Federal Trade Commission had viewed the prohibitions of original § 7. See F. T. C. Ann. Rep. 6–7 (1929); Statement by General Counsel Kelley in Hearings before Subcommittee 3 of the House Committee on the Judiciary on H. R. 2734, 81st Cong., 1st Sess. (hereinafter cited as H. R. Hearings on H. R. 2734) 38. However, we have held, since the adoption of the 1950 amendments, that such a construction of § 7 was incorrect. *United States* v. *E. I. du Pont de Nemours & Co.*, 353 U. S. 586.

[22] For expressions of this questionable view of the background of the original Act see F. T. C., The Merger Movement: A Summary Report 2 (1948); testimony of then Representative Kefauver, in Hearings before Subcommittee 2 of the House Committee on the Judiciary on H. R. 515, 80th Cong., 1st Sess. (hereinafter cited as Hearings on H. R. 515) 4–5; remarks of Senator O'Mahoney, 96 Cong. Rec. 16443; H. R. Rep. No. 1191, 81st Cong., 1st Sess. 4–5. For a critique of this understanding of the Act see *United States* v. *E. I. du Pont de Nemours & Co.*, 353 U. S. 586, 613–615 (dissent), and reviews cited in note 19, *supra*.

[23] See 51 Cong. Rec. 14255, 14316, 14456–14457 (remarks of Senators Chilton, Cummins, Colt, Reed). An amendment offered during the Senate's floor debate by Senator Cummins would have precluded the acquisition by one corporation of the stock "or any other means

314

tant to an Act then conceived to be directed primarily at the development of holding companies and at the secret acquisition of competitors through the purchase of all or parts of such competitors' stock.[24]

It was, however, not long before the Federal Trade Commission recognized deficiencies in the Act as first enacted. Its Annual Reports frequently suggested amendments, principally along two lines: first, to "plug the loophole" exempting asset acquisitions from coverage under the Act, and second, to require companies proposing a merger to give the Commission prior notification of their plans.[25] The Final Report of the Temporary National Economic Committee also recommended changes focusing on these two proposals.[26] Hearings were held on some bills incorporating either or both of these changes but, prior to the amendments adopted in 1950, none reached the floor of Congress for plenary consideration. Although the bill that was eventually to become amended § 7 was confined to embracing within the Act's terms the

of control or participation in the control" of two or more other corporations carrying on business of the same kind or competitive in character. The amendment was not directed at asset acquisitions specifically and was, in any event, overwhelmingly defeated. 51 Cong. Rec. 14315, 14473–14476.

[24] See 51 Cong. Rec. 9073–9074, 9271, 14226, 14254, 14316, 14420, 14465–14466 (remarks of Representatives Webb and Carlin and Senators Reed, Cummins and Poindexter); H. R. Rep. No. 627, 63d Cong., 2d Sess. 17; S. Rep. No. 698, 63d Cong., 2d Sess. 13.

[25] See F. T. C. Ann. Rep. for 1928, 19; id. for 1929, at 6, 59; id. for 1930, at 50–51; id. for 1935, at 16, 48; id. for 1936, at 48; id. for 1937, at 15; id. for 1938, at 11, 19, 29; id. for 1939, at 14, 16; id. for 1940, at 12–13; id. for 1941, at 19–20; id. for 1942, at 9; id. for 1943, at 9; id. for 1944, at 8; id. for 1945, at 8–9; id. for 1946, at 12; id. for 1947, at 12; id. for 1948, at 11, 16. The Commission has continued unsuccessfully to urge adoption of the prior notification provision. See id. for 1958, at 7; id. for 1960, at 12.

[26] Temporary National Economic Committee, Final Report and Recommendations, S. Doc. No. 35, 77th Cong., 1st Sess. 38–40 (1941).

acquisition of assets as well as stock, in the course of the hearings conducted in both the Eightieth and Eighty-first Congresses, a more far-reaching examination of the purposes and provisions of § 7 was undertaken. A review of the legislative history of these amendments provides no unmistakably clear indication of the precise standards the Congress wished the Federal Trade Commission and the courts to apply in judging the legality of particular mergers. However, sufficient expressions of a consistent point of view may be found in the hearings, committee reports of both the House and Senate and in floor debate to provide those charged with enforcing the Act with a usable frame of reference within which to evaluate any given merger.

The dominant theme pervading congressional consideration of the 1950 amendments was a fear of what was considered to be a rising tide of economic concentration in the American economy. Apprehension in this regard was bolstered by the publication in 1948 of the Federal Trade Commission's study on corporate mergers. Statistics from this and other current studies were cited as evidence of the danger to the American economy in unchecked corporate expansions through mergers.[27] Other considerations cited in support of the bill were the desir-

---

[27] F. T. C., The Present Trend of Corporate Mergers and Acquisitions, reprinted in Hearings on H. R. 515, at 300–317; F. T. C., The Merger Movement: A Summary Report, *passim;* 95 Cong. Rec. 11500–11507; 96 Cong. Rec. 16433, 16444, 16457; S. Rep. No. 1775, 81st Cong., 2d Sess. 3. The House Report on the amendments summarized its view of the situation:

"That the current merger movement [during the years 1940–1947] has had a significant effect on the economy is clearly revealed by the fact that the asset value of the companies which have disappeared through mergers amounts to 5.2 billion dollars, or no less than 5.5 percent of the total assets of all manufacturing corporations—a significant segment of the economy to be swallowed up in such a short period of time." H. R. Rep. No. 1191, 81st Cong., 1st Sess. 3.

ability of retaining "local control" over industry and the protection of small businesses.[28] Throughout the recorded discussion may be found examples of Congress' fear not only of accelerated concentration of economic power on economic grounds, but also of the threat to other values a trend toward concentration was thought to pose.

What were some of the factors, relevant to a judgment as to the validity of a given merger, specifically discussed by Congress in redrafting § 7?

First, there is no doubt that Congress did wish to "plug the loophole" and to include within the coverage of the Act the acquisition of assets no less than the acquisition of stock.[29]

---

[28] See, e. g., 95 Cong. Rec. 11486, 11489, 11494–11495, 11498; 96 Cong. Rec. 16444, 16448, 16450, 16452, 16503 (remarks by the cosponsors of the amendments, Representative Celler and Senator Kefauver, and by Representatives Bryson, Keating and Patman and Senators Murray and Aiken). Cf. *United States* v. *Aluminum Co. of America*, 148 F. 2d 416, 429 (C. A. 2d Cir., per Learned Hand, J.): "Throughout the history of these [antitrust] statutes it has been constantly assumed that one of their purposes was to perpetuate and preserve, for its own sake and in spite of possible cost, an organization of industry in small units which can effectively compete with each other."

[29] Virtually every member of Congress who spoke in support of the amendments, indicated that this aspect of the legislation was its salient characteristic. Representative Kefauver, one of the Act's sponsors, testified, "The bill is not complicated. It proposes simply to plug the loophole in sections 7 and 11 of the Clayton Act." Hearings on H. R. 515, at 4. The Senate Report on the measure finally adopted summarized the "Purpose" of the amendment with this single paragraph:

"The purpose of the proposed legislation is to prevent corporations from acquiring another corporation by means of the acquisition of its assets, whereunder [sic] the present law it is prohibited from acquiring the stock of said corporation. Since the acquisition of stock is significant chiefly because it is likely to result in control of the underlying assets, failure to prohibit direct purchase of the same assets has been inconsistent and paradoxical as to the over-all effect of existing law." S. Rep. No. 1775, 81st Cong., 2d Sess. 2.

Second, by the deletion of the "acquiring-acquired" language in the original text,[30] it hoped to make plain that § 7 applied not only to mergers between actual competitors, but also to vertical and conglomerate mergers whose effect may tend to lessen competition in any line of commerce in any section of the country.[31]

Third, it is apparent that a keystone in the erection of a barrier to what Congress saw was the rising tide of economic concentration, was its provision of authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency. Congress saw the process of concentration in American business as a dynamic force; it sought to assure the Federal Trade Commission and the courts the power

---

[30] The deletion of the "acquiring-acquired" test was the direct result of an amendment offered by the Federal Trade Commission. In presenting the proposed change, Commission Counsel Kelley made the following points: this Court's decisions had implied that the effect on competition between the parties to the merger was not the only test of the illegality of a stock merger; the Court had applied Sherman Act tests to Clayton Act cases and thus judged the effect of a merger on the industry as a whole; this incorporation of Sherman Act tests, with the accompanying "rule of reason," was inadequate for reaching some mergers which the Commission felt were not in the public interest; and the new amendment proposed a middle ground between what appeared to be an overly restrictive test insofar as mergers between competitors were concerned, and what appeared to the Commission to be an overly lenient test insofar as all other mergers were concerned. Congressman Kefauver supported this amendment and the Commission's proposal was then incorporated into the bill which was eventually adopted by the Congress. See Hearings on H. R. 515, at 23, 117–119, 238–240, 259; Hearings before a Subcommittee of the Senate Judiciary Committee on H. R. 2734, 81st Cong., 1st Sess. (hereinafter cited as S. Hearings on H. R. 2734) 147.

[31] That § 7 was intended to apply to all mergers—horizontal, vertical or conglomerate—was specifically reiterated by the House Report on the final bill. H. R. Rep. No. 1191, 81st Cong., 1st Sess. 11. And see note 21, *supra*.

to brake this force at its outset and before it gathered momentum.[32]

Fourth, and closely related to the third, Congress rejected, as inappropriate to the problem it sought to remedy, the application to § 7 cases of the standards for judging the legality of business combinations adopted by the courts in dealing with cases arising under the Sherman Act, and which may have been applied to some early cases arising under original § 7.[33]

[32] That § 7 of the Clayton Act was intended to reach incipient monopolies and trade restraints outside the scope of the Sherman Act was explicitly stated in the Senate Report on the original Act. S. Rep. No. 698, 63d Cong., 2d Sess. 1. See United States v. E. I. du Pont de Nemours & Co., 353 U. S. 586, 589. This theme was reiterated in congressional consideration of the amendments adopted in 1950, and found expression in the final House and Senate Reports on the measure. H. R. Rep. No. 1191, 81st Cong., 1st Sess. 8 ("Acquisitions of stock or assets have a cumulative effect, and control of the market . . . may be achieved not in a single acquisition but as the result of a series of acquisitions. The bill is intended to permit intervention in such a cumulative process when the effect of an acquisition may be a significant reduction in the vigor of competition."); S. Rep. No. 1775, 81st Cong., 2d Sess. 4–5 ("The intent here . . . is to cope with monopolistic tendencies in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding."). And see F. T. C., The Merger Movement: A Summary Report 6–7.

[33] The Report of the House Judiciary Committee on H. R. 515 recommended the adoption of tests more stringent than those in the Sherman Act. H. R. Rep. No. 596, 80th Cong., 1st Sess. 7. A vigorous minority thought no new legislation was needed. Id., at 11–18. Between the issuance of this Report and the Committee's subsequent consideration of H. R. 2734, this Court had decided United States v. Columbia Steel Co., 334 U. S. 495, which some understood to indicate that existing law might be inadequate to prevent mergers that had substantially lessened competition in a section of the country, but which, nevertheless, had not risen to the level of those restraints of trade or monopoly prohibited by the Sherman Act. See 96 Cong. Rec. 16502 (remarks of Senator Kefauver);

Fifth, at the same time that it sought to create an effective tool for preventing all mergers having demonstrable anticompetitive effects, Congress recognized the stimulation to competition that might flow from particular mergers. When concern as to the Act's breadth was expressed, supporters of the amendments indicated that it would not impede, for example, a merger between two small companies to enable the combination to compete more effectively with larger corporations dominating the relevant market, nor a merger between a corporation which is financially healthy and a failing one which no longer can be a vital competitive factor in the market.[34]

---

H. R. Rep. No. 1191, 81st Cong., 1st Sess. 10–11. Numerous other statements by Congressmen and Senators and by representatives of the Federal Trade Commission, the Department of Justice and the President's Council of Economic Advisors were made to the Congress suggesting that a standard of illegality stricter than that imposed by the Sherman Act was needed. See, *e. g.*, H. R. Hearings on H. R. 2734, at 13, 29, 41, 117; S. Hearings on H. R. 2734, at 22, 23, 47, 66, 319. The House Judiciary Committee's 1949 Report supported this concept unanimously although five of the nine members who had dissented two years earlier in H. R. Rep. No. 596 were still serving on the Committee. H. R. Rep. No. 1191, 81st Cong., 1st Sess. 7–8. The Senate Report was explicit: "The committee wish to make it clear that the bill is not intended to revert to the Sherman Act test. The intent here . . . is to cope with monopolistic tendencies in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding. . . . [The] various additions and deletions—some strengthening and others weakening the bill—are not conflicting in purpose and effect. They merely are different steps toward the same objective, namely, that of framing a bill which, though dropping portions of the so-called Clayton Act test that have no economic significance [the reference would appear to be primarily to the "acquiring-acquired" standard of the original Act], reaches far beyond the Sherman Act." S. Rep. No. 1775, 81st Cong., 2d Sess. 4–5.

[34] As to small company mergers, see H. R. Hearings on H. R. 2734, at 41, 117; S. Hearings on H. R. 2734, at 6, 51; 95 Cong. Rec. 11486, 11488, 11506; 96 Cong. Rec. 16436; H. R. Rep. No. 1191, 81st Cong.,

320

The deletion of the word "community" in the original Act's description of the relevant geographic market is another illustration of Congress' desire to indicate that its concern was with the adverse effects of a given merger on competition only in an economically significant "section" of the country.[35] Taken as a whole, the legislative history illuminates congressional concern with the protection of *competition*, not *competitors*, and its desire to restrain mergers only to the extent that such combinations may tend to lessen competition.

Sixth, Congress neither adopted nor rejected specifically any particular tests for measuring the relevant markets, either as defined in terms of product or in terms of geographic locus of competition, within which the anti-

---

1st Sess. 6–8; S. Rep. No. 1775, 81st Cong., 2d Sess. 4. As to mergers with failing companies, see S. Hearings on H. R. 2734, at 115, 134–135, 198; 96 Cong. Rec. 16435, 16444; H. R. Rep. No. 1191, *supra*, at 6; S. Rep. No. 1775, *supra*, at 7.

[35] The Federal Trade Commission's amendment, see note 30, *supra*, included the phrase "where . . . in any section, community, or trade area, there is reasonable probability that the effect of such acquisition may be to substantially lessen competition." Congressman Kefauver urged deletion of the word "community" on the ground that it might suggest, for example, that a merger between two small filling stations in a section of a city was proscribed. Hearings on H. R. 515, at 260. And see also 96 Cong. Rec. 16453. The fear of literal prohibition of all but *de minimis* mergers through the use of the word "community" was also cited by the Senate Report as the basis for its retention solely of the word "section." S. Rep. No. 1775, 81st Cong., 2d Sess. 4. The reference to "trade area" was deleted as redundant, when it became clear that the "section" of the country to which the Act was to apply, referred not to a definite geographic area of the country, but rather the geographic area of effective competition in the relevant line of commerce. See S. Hearings on H. R. 2734, at 38–52, 66–84, 101–102, 132, 133, 144, 145; H. R. Rep. No. 1191, 81st Cong., 1st Sess. 8; S. Rep. No. 1775, 81st Cong., 2d Sess. 4, 5–6. The Senate Report cited with approval the definition of the market employed by the Court in *Standard Oil Co. of California* v. *United States,* 337 U. S. 293, 299 n. 5.

competitive effects of a merger were to be judged. Nor did it adopt a definition of the word "substantially," whether in quantitative terms of sales or assets or market shares or in designated qualitative terms, by which a merger's effects on competition were to be measured.[36]

Seventh, while providing no definite quantitative or qualitative tests by which enforcement agencies could gauge the effects of a given merger to determine whether it may "substantially" lessen competition or tend toward monopoly, Congress indicated plainly that a merger had to be functionally viewed, in the context of its particular

---

[36] The House Report on H. R. 2734 stated that two tests of illegality were included in the proposed Act: whether the merger substantially lessened competition or tended to create a monopoly. It stated that such effects could be perceived through findings, for example, that a whole or material part of the competitive activity of an enterprise, which had been a substantial factor in competition, had been eliminated; that the relative size of the acquiring corporation had increased to such a point that its advantage over competitors threatened to be "decisive"; that an "undue" number of competing enterprises had been eliminated; or that buyers and sellers in the relevant market had established relationships depriving their rivals of a fair opportunity to compete. H. R. Rep. No. 1191, 81st Cong., 1st Sess. 8. Each of these standards, couched in general language, reflects a conscious avoidance of exclusively mathematical tests even though the case of *Standard Oil Co. of California* v. *United States*, 337 U. S. 293, said to have created a "quantitative substantiality" test for suits arising under § 3 of the Clayton Act, was decided while Congress was considering H. R. 2734. Some discussion of the applicability of this test to § 7 cases ensued, see, *e. g.*, S. Hearings on H. R. 2734, at 31–32, 169–172; S. Rep. No. 1775, 81st Cong., 2d Sess. 21; 96 Cong. Rec. 16443, but this aspect of the *Standard Oil* decision was neither specifically endorsed nor impugned by the bill's supporters. However, the House Judiciary Committee's Report, issued two months after *Standard Oil* had been decided, remarked that the tests of illegality under the new Act were intended to be "similar to those which the courts have applied in interpreting the same language as used in other sections of the Clayton Act." H. R. Rep. No. 1191, 81st Cong., 1st Sess. 8.

industry.[37] That is, whether the consolidation was to take place in an industry that was fragmented rather than concentrated, that had seen a recent trend toward domination by a few leaders or had remained fairly consistent in its distribution of market shares among the participating companies, that had experienced easy access to markets by suppliers and easy access to suppliers by buyers or had witnessed foreclosure of business, that had witnessed the ready entry of new competition or the erection of barriers to prospective entrants, all were aspects, varying in importance with the merger under consideration, which would properly be taken into account.[38]

---

[37] A number of the supporters of the amendments voiced their concern that passage of the bill would amount to locking the barn door after most of the horses had been stolen, but urged approval of the measure to prevent the theft of those still in the barn. Which was to say that, if particular industries had not yet been subject to the congressionally perceived trend toward concentration, adoption of the amendments was urged as a way of preventing the trend from reaching those industries as yet unaffected. See, e. g., 95 Cong. Rec. 11489, 11494, 11498 (remarks of Representatives Keating, Yates, Patman); 96 Cong. Rec. 16444 (remarks of Senators O'Mahoney, Murray).

[38] Subsequent to the adoption of the 1950 amendments, both the Federal Trade Commission and the courts have, in the light of Congress' expressed intent, recognized the relevance and importance of economic data that places any given merger under consideration within an industry framework almost inevitably unique in every case. Statistics reflecting the shares of the market controlled by the industry leaders and the parties to the merger are, of course, the primary index of market power; but only a further examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger. See, e. g., Pillsbury Mills, Inc., 50 F. T. C. 555; United States v. Bethlehem Steel Corp., 168 F. Supp. 576 (D. C. S. D. N. Y.); United States v. Jerrold Electronics Corp., 187 F. Supp. 545 (D. C. E. D. Pa.), aff'd, 365 U. S. 567. And see U. S. Atty. Gen. Nat. Comm to Study the Antitrust Laws, Report 126 (1955).

Eighth, Congress used the words *"may be* substantially to lessen competition" (emphasis supplied), to indicate that its concern was with probabilities, not certainties.[39] Statutes existed for dealing with clear-cut menaces to competition; no statute was sought for dealing with ephemeral possibilities. Mergers with a probable anticompetitive effect were to be proscribed by this Act.

It is against this background that we return to the case before us.

## IV.

### THE VERTICAL ASPECTS OF THE MERGER.

Economic arrangements between companies standing in a supplier-customer relationship are characterized as "vertical." The primary vice of a vertical merger or other arrangement tying a customer to a supplier is that,

---

[39] In the course of both the Committee hearings and floor debate, attention was occasionally focused on the issue of whether "possible," "probable" or "certain" anticompetitive effects of a proposed merger would have to be proven to establish a violation of the Act. Language was quoted from prior decisions of the Court in antitrust cases in which each of these interpretations of the word "may" was suggested as appropriate. H. R. Hearings on H. R. 2734, at 74; S. Hearings on H. R. 2734, at 32, 33, 160–168; 96 Cong. Rec. 16453, 16502. The final Senate Report on the question was explicit on the point:

"The use of these words ["may be"] means that the bill, if enacted, would not apply to the mere possibility but only to the reasonable probability of the prescribed [*sic*] effect . . . . The words 'may be' have been in section 7 of the Clayton Act since 1914. The concept of reasonable probability conveyed by these words is a necessary element in any statute which seeks to arrest restraints of trade in their incipiency and before they develop into full-fledged restraints violative of the Sherman Act. A requirement of certainty and actuality of injury to competition is incompatible with any effort to supplement the Sherman Act by reaching incipient restraints." S. Rep. No. 1775, 81st Cong., 2d Sess. 6. See also 51 Cong. Rec. 14464 (remarks of Senator Reed).

324

by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a "clog on competition," *Standard Oil Co. of California* v. *United States*, 337 U. S. 293, 314, which "deprive[s] . . . rivals of a fair opportunity to compete." [40] H. R. Rep. No. 1191, 81st Cong., 1st Sess. 8. Every extended vertical arrangement by its very nature, for at least a time, denies to competitors of the supplier the opportunity to compete for part or all of the trade of the customer-party to the vertical arrangement. However, the Clayton Act does not render unlawful all such vertical arrangements, but forbids only those whose effect "may be substantially to lessen competition, or to tend to create a monopoly" "in any line of commerce in any section of the country." Thus, as we have previously noted,

> "[d]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition 'within the area of effective competition.' Substantiality can be determined only in terms of the market affected." [41]

The "area of effective competition" must be determined by reference to a product market (the "line of commerce") and a geographic market (the "section of the country").

---

[40] In addition, a vertical merger may disrupt and injure competition when those independent customers of the supplier who are in competition with the merging customer, are forced either to stop handling the supplier's lines, thereby jeopardizing the goodwill they have developed, or to retain the supplier's lines, thereby forcing them into competition with their own supplier. See *United States* v. *Bethlehem Steel Corp.*, 168 F. Supp. 576, 613 (D. C. S. D. N. Y.). See also GX 13, R. 215, a letter from Sam Sullivan, an independent shoe retailer, to Clark Gamble, President of Brown Shoe Co.

[41] *United States* v. *E. I. du Pont de Nemours & Co.*, 353 U. S. 586, 593.

*The Product Market.*

The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.[42] However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. *United States* v. *E. I. du Pont de Nemours & Co.,* 353 U. S. 586, 593–595. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.[43] Because § 7 of the Clayton Act prohibits any merger which may substantially lessen competition "in *any* line of commerce" (emphasis supplied), it is necessary to examine the effects of a merger in each such economically significant submarket to determine if there is a reasonable probability that the merger will substantially lessen competition. If such a probability is found to exist, the merger is proscribed.[44]

---

[42] The cross-elasticity of production facilities may also be an important factor in defining a product market within which a vertical merger is to be viewed. Cf. *United States* v. *Columbia Steel Co.,* 334 U. S. 495, 510–511; *United States* v. *Bethlehem Steel Corp.,* 168 F. Supp. 576, 592 (D. C. S. D. N. Y.). However, the District Court made but limited findings concerning the feasibility of interchanging equipment in the manufacture of nonrubber footwear. At the same time, the record supports the court's conclusion that individual plants generally produced shoes in only one of the product lines the court found relevant.

[43] See generally Bock, Mergers and Markets, An Economic Analysis of Case Law 25–35 (1960).

[44] *United States* v. *E. I. du Pont de Nemours & Co.,* 353 U. S. 586, 592, 595; *A. G. Spalding & Bros.* v. *Federal Trade Comm'n,* 301 F. 2d 585, 603 (C. A. 3d Cir.); *American Crystal Sugar Co.* v. *Cuban-*

Applying these considerations to the present case, we conclude that the record supports the District Court's finding that the relevant lines of commerce are men's, women's, and children's shoes. These product lines are recognized by the public; each line is manufactured in separate plants; each has characteristics peculiar to itself rendering it generally noncompetitive with the others; and each is, of course, directed toward a distinct class of customers.

Appellant, however, contends that the District Court's definitions fail to recognize sufficiently "price/quality" and "age/sex" distinctions in shoes. Brown argues that the predominantly medium-priced shoes which it manufactures occupy a product market different from the predominantly low-priced shoes which Kinney sells. But agreement with that argument would be equivalent to holding that medium-priced shoes do not compete with low-priced shoes. We think the District Court properly found the facts to be otherwise. It would be unrealistic to accept Brown's contention that, for example, men's shoes selling below $8.99 are in a different product market from those selling above $9.00.

This is not to say, however, that "price/quality" differences, where they exist, are unimportant in analyzing a merger; they may be of importance in determining the likely effect of a merger. But the boundaries of the relevant market must be drawn with sufficient breadth to include the competing products of each of the merging companies and to recognize competition where, in fact, competition exists. Thus we agree with the District Court that in this case a further division of product lines based on "price/quality" differences would be "unrealistic."

American Sugar Co., 259 F. 2d 524, 527 (C. A. 2d Cir.); United States v. Bethlehem Steel Corp., 168 F. Supp. 576, 603 (D. C. S. D. N. Y.). See also note 39, supra.

Brown's contention that the District Court's product market definitions should have recognized further "age/sex" distinctions raises a different problem. Brown's sharpest criticism is directed at the District Court's finding that children's shoes constituted a single line of commerce. Brown argues, for example, that "a little boy does not wear a little girl's black patent leather pump" and that "[a] male baby cannot wear a growing boy's shoes." Thus Brown argues that "infants' and babies'" shoes, "misses' and children's" shoes and "youths' and boys'" shoes should each have been considered a separate line of commerce. Assuming, *arguendo,* that little boys' shoes, for example, do have sufficient peculiar characteristics to constitute one of the markets to be used in analyzing the effects of this merger, we do not think that in this case the District Court was required to employ finer "age/sex" distinctions than those recognized by its classifications of "men's," "women's," and "children's" shoes. Further division does not aid us in analyzing the effects of this merger. Brown manufactures about the same percentage of the Nation's children's shoes (5.8%) as it does of the Nation's youths' and boys' shoes (6.5%), of the Nation's misses' and children's shoes (6.0%) and of the Nation's infants' and babies' shoes (4.9%). Similarly, Kinney sells about the same percentage of the Nation's children's shoes (2%) as it does of the Nation's youths' and boys' shoes (3.1%), of the Nation's misses' and children's shoes (1.9%), and of the Nation's infants' and babies' shoes (1.5%). Appellant can point to no advantage it would enjoy were finer divisions than those chosen by the District Court employed. Brown manufactures significant, comparable quantities of virtually every type of nonrubber men's, women's, and children's shoes, and Kinney sells such quantities of virtually every type of men's, women's, and children's shoes. Thus, whether considered separately or together, the picture of this

merger is the same. We, therefore, agree with the District Court's conclusion that in the setting of this case to subdivide the shoe market further on the basis of "age/sex" distinctions would be "impractical" and "unwarranted."

*The Geographic Market.*

We agree with the parties and the District Court that insofar as the vertical aspect of this merger is concerned, the relevant geographic market is the entire Nation. The relationships of product value, bulk, weight and consumer demand enable manufacturers to distribute their shoes on a nationwide basis, as Brown and Kinney, in fact, do. The anticompetitive effects of the merger are to be measured within this range of distribution.

*The Probable Effect of the Merger.*

Once the area of effective competition affected by a vertical arrangement has been defined, an analysis must be made to determine if the effect of the arrangement "may be substantially to lessen competition, or to tend to create a monopoly" in this market.

Since the diminution of the vigor of competition which may stem from a vertical arrangement results primarily from a foreclosure of a share of the market otherwise open to competitors, an important consideration in determining whether the effect of a vertical arrangement "may be substantially to lessen competition, or to tend to create a monopoly" is the size of the share of the market foreclosed. However, this factor will seldom be determinative. If the share of the market foreclosed is so large that it approaches monopoly proportions, the Clayton Act will, of course, have been violated; but the arrangement will also have run afoul of the Sherman Act.[45] And the legislative history of § 7 indicates clearly that the

---

[45] 15 U. S. C. §§ 1 and 2. See S. Rep. No. 1775, 81st Cong., 2d Sess. 4–5.

tests for measuring the legality of any particular economic arrangement under the Clayton Act are to be less stringent than those used in applying the Sherman Act.[46] On the other hand, foreclosure of a *de minimis* share of the market will not tend "substantially to lessen competition."

Between these extremes, in cases such as the one before us, in which the foreclosure is neither of monopoly nor *de minimis* proportions, the percentage of the market foreclosed by the vertical arrangement cannot itself, be decisive. In such cases, it becomes necessary to undertake an examination of various economic and historical factors in order to determine whether the arrangement under review is of the type Congress sought to proscribe.[47]

A most important such factor to examine is the very nature and purpose of the arrangement.[48] Congress not only indicated that "the tests of illegality [under § 7] are intended to be similar to those which the courts have applied in interpreting the same language as used in other sections of the Clayton Act," [49] but also chose for § 7 language virtually identical to that of § 3 of the Clayton Act, 15 U. S. C. § 14, which had been interpreted by this Court to require an examination of the interdependence of the market share foreclosed by, and the economic purpose of, the vertical arrangement. Thus, for example, if a particular vertical arrangement, considered under § 3, appears to be a limited term exclusive-dealing contract,

---

[46] See note 33, *supra.*

[47] See note 38, *supra,* and note 55, *infra,* and the accompanying text.

[48] Although it is "unnecessary for the Government to speculate as to what is in the 'back of the minds' of those who promote a merger," H. R. Rep. No. 1191, 81st Cong., 1st Sess. 8, evidence indicating the purpose of the merging parties, where available, is an aid in predicting the probable future conduct of the parties and thus the probable effects of the merger. *Swift & Co.* v. *United States,* 196 U. S. 375, 396; *United States* v. *Maryland & Virginia Milk Producers Assn.,* 167 F. Supp. 799, 804 (D. C. D. C.), aff'd, 362 U. S. 458.

[49] See H. R. Rep. No. 1191, 81st Cong., 1st Sess. 8.

the market foreclosure must generally be significantly greater than if the arrangement is a tying contract before the arrangement will be held to have violated the Act. Compare *Tampa Electric Co.* v. *Nashville Coal Co.*, 365 U. S. 320, and *Standard Oil Co. of California* v. *United States, supra,* with *International Salt Co.* v. *United States,* 332 U. S. 392.[50] The reason for this is readily discernible. The usual tying contract forces the customer to take a product or brand he does not necessarily want in order to secure one which he does desire. Because such an arrangement is inherently anticompetitive, we have held that its use by an established company is likely "substantially to lessen competition" although only a relatively small amount of commerce is affected. *International Salt Co.* v. *United States, supra.* Thus, unless the tying device is employed by a small company in an attempt to break into a market, cf. *Harley-Davidson Motor Co.*, 50 F. T. C. 1047, 1066, the use of a tying device can rarely[51] be harmonized with the strictures of the antitrust laws, which are intended primarily to preserve and stimulate competition. See *Standard Oil Co. of California* v. *United States, supra,* at 305–306. On the other hand, requirement contracts are frequently negotiated at the behest of the customer who has chosen the particular supplier and his product upon the basis of competitive merit. See, *e. g., Tampa Electric Co.* v. *Nashville Coal Co., supra.* Of course, the fact that requirement contracts are not inherently anticompetitive will not save a particular agreement if, in fact, it is likely "substantially to lessen competition, or to tend to create a monopoly." *E. g., Standard Oil Co. of California* v. *United States, supra.* Yet a requirement contract may escape censure if only a

---

[50] See also Comment, 59 Mich. L. Rev. 1236, 1239–1240 (1961).

[51] Compare *Standard Oil Co. of California* v. *United States,* 337 U. S. 293, 306, with *Federal Trade Comm'n* v. *Sinclair Refining Co.,* 261 U. S. 463.

small share of the market is involved, if the purpose of the agreement is to insure to the customer a sufficient supply of a commodity vital to the customer's trade or to insure to the supplier a market for his output and if there is no trend toward concentration in the industry. *Tampa Electric Co.* v. *Nashville Coal Co., supra.* Similar considerations are pertinent to a judgment under § 7 of the Act.

The importance which Congress attached to economic purpose is further demonstrated by the Senate and House Reports on H. R. 2734, which evince an intention to preserve the "failing company" doctrine of *International Shoe Co.* v. *Federal Trade Comm'n,* 280 U. S. 291.[52] Similarly, Congress foresaw that the merger of two large companies or a large and a small company might violate the Clayton Act while the merger of two small companies might not, although the share of the market foreclosed be identical, if the purpose of the small companies is to enable them in combination to compete with larger corporations dominating the market.[53]

The present merger involved neither small companies nor failing companies. In 1955, the date of this merger, Brown was the fourth largest manufacturer in the shoe industry with sales of approximately 25 million pairs of shoes and assets of over $72,000,000 while Kinney had sales of about 8 million pairs of shoes and assets of about $18,000,000. Not only was, Brown one of the leading manufacturers of men's, women's, and children's shoes, but Kinney, with over 350 retail outlets, owned and operated the largest independent chain of family shoe stores in the Nation. Thus, in this industry, no merger between

---

[52] H. R. Rep. No. 1191, 81st Cong., 1st Sess. 6; S. Rep. No. 1775, 81st Cong., 2d Sess. 7.

[53] See note 34, *supra.* Compare *Harley-Davidson Co.,* 50 F. T. C. 1047, 1066, and U. S. Atty. Gen. Nat. Comm. to Study the Antitrust Laws, Report 143 (1955).

a manufacturer and an independent retailer could involve a larger potential market foreclosure. Moreover, it is apparent both from past behavior of Brown and from the testimony of Brown's President,[54] that Brown would use its ownership of Kinney to force Brown shoes into Kinney stores. Thus, in operation this vertical arrangement would be quite analogous to one involving a tying clause.[55]

Another important factor to consider is the trend toward concentration in the industry.[56] It is true, of course, that the statute prohibits a given merger only if the effect of *that* merger may be substantially to lessen competition.[57] But the very wording of § 7 requires a prognosis of the probable *future* effect of the merger.[58]

The existence of a trend toward vertical integration, which the District Court found, is well substantiated by the record. Moreover, the court found a tendency of the acquiring manufacturers to become increasingly important sources of supply for their acquired outlets. The necessary corollary of these trends is the foreclosure of independent manufacturers from markets otherwise open to them. And because these trends are not the product of accident but are rather the result of deliberate policies of Brown and other leading shoe manufacturers, account must be taken of these facts in order to predict the prob-

[54] See note 8, *supra.*

[55] Moreover, ownership integration is a more permanent and irreversible tie than is contract integration. See Kessler and Stern, Competition, Contract, and Vertical Integration, 69 Yale L. J. 1, 78 (1959).

[56] See generally *Pillsbury Mills, Inc.,* 50 F. T. C. 555, 572–573; *United States* v. *Bethlehem Steel Corp.,* 168 F. Supp. 576, 606 (D. C. S. D. N. Y.); Stigler, Mergers and Preventive Antitrust Policy, 104 U. of Pa. L. Rev. 176, 180 (1955); U. S. Atty. Gen. Nat. Comm. to Study the Antitrust Laws, Report 124 (1955).

[57] See Handler and Robinson, A Decade of Administration of the Celler-Kefauver Antimerger Act, 61 Col. L. Rev. 629, 668 (1961).

[58] See note 39, *supra,* and accompanying text.

able future consequences of this merger. It is against this background of continuing concentration that the present merger must be viewed.

Brown argues, however, that the shoe industry is at present composed of a large number of manufacturers and retailers, and that the industry is dynamically competitive. But remaining vigor cannot immunize a merger if the trend in that industry is toward oligopoly. See *Pillsbury Mills, Inc.*, 50 F. T. C. 555, 573. It is the probable effect of the merger upon the future as well as the present which the Clayton Act commands the courts and the Commission to examine.[59]

Moreover, as we have remarked above, not only must we consider the probable effects of the merger upon the economics of the particular markets affected but also we must consider its probable effects upon the economic way of life sought to be preserved by Congress.[60] Congress was desirous of preventing the formation of further oligopolies with their attendant adverse effects upon local control of industry and upon small business. Where an industry was composed of numerous independent units, Congress appeared anxious to preserve this structure. The Senate Report, quoting with approval from the Federal Trade Commission's 1948 report on the merger movement, states explicitly that amended § 7 is addressed, *inter alia,* to the following problem:

> "Under the Sherman Act, an acquisition is unlawful if it creates a monopoly or constitutes an attempt to monopolize. Imminent monopoly may appear when one large concern acquires another, but it is unlikely to be perceived in a small acquisition by a large enterprise. As a large concern grows through a series of such small acquisitions, its accretions of

---

[59] *United States* v. *E. I. du Pont de Nemours & Co.,* 353 U. S. 586, 589, 597.

[60] See note 28, *supra,* and accompanying text.

334

power are individually so minute as to make it difficult to use the Sherman Act test against them. . . .

"Where several large enterprises are extending their power by successive small acquisitions, the cumulative effect of their purchases may be to convert an industry from one of intense competition among many enterprises to one in which three or four large concerns produce the entire supply." S. Rep. No. 1775, 81st Cong., 2d Sess. 5.[61] And see H. R. Rep. No. 1191, 81st Cong., 1st Sess. 8.

The District Court's findings, and the record facts, many of them set forth in Part I of this opinion, convince us that the shoe industry is being subjected to just such a cumulative series of vertical mergers which, if left unchecked, will be likely "substantially to lessen competition."

We reach this conclusion because the trend toward vertical integration in the shoe industry, when combined with Brown's avowed policy of forcing its own shoes upon its retail subsidiaries, may foreclose competition from a substantial share of the markets for men's, women's, and children's shoes, without producing any countervailing competitive, economic, or social advantages.

## V.

### The Horizontal Aspects of the Merger.

An economic arrangement between companies performing similar functions in the production or sale of comparable goods or services is characterized as "horizontal." The effect on competition of such an arrangement depends, of course, upon its character and scope. Thus, its validity in the face of the antitrust laws will depend upon such factors as: the relative size and number of the

[61] See also Stigler, Mergers and Preventive Antitrust Policy, 104 U. of Pa. L. Rev. 176, 180 (1955).

parties to the arrangement; whether it allocates shares of the market among the parties; whether it fixes prices at which the parties will sell their product; or whether it absorbs or insulates competitors.[62] Where the arrangement effects a horizontal merger between companies occupying the same product and geographic market, whatever competition previously may have existed in that market between the parties to the merger is eliminated. Section 7 of the Clayton Act, prior to its amendment, focused upon this aspect of horizontal combinations by proscribing acquisitions which might result in a lessening of competition between the acquiring and the acquired companies.[63] The 1950 amendments made plain Congress' intent that the validity of such combinations was to be gauged on a broader scale: their effect on competition generally in an economically significant market.

Thus, again, the proper definition of the market is a "necessary predicate" to an examination of the competition that may be affected by the horizontal aspects of the merger. The acquisition of Kinney by Brown resulted in a horizontal combination at both the manufacturing and retailing levels of their businesses. Although the District Court found that the merger of Brown's and Kinney's *manufacturing* facilities was economically too insignificant to come within the prohibitions of the Clayton Act, the Government has not appealed from this portion of the lower court's decision. Therefore, we have no occasion to express our views with respect to that finding. On the other hand, appellant does contest the District Court's finding that the merger of the companies' *retail* outlets may tend substantially to lessen competition.

---

[62] See, *e. g., United States* v. *Trenton Potteries Co.*, 273 U. S. 392; *Sugar Institute, Inc.*, v. *United States*, 297 U. S. 553; *United States* v. *Paramount Pictures*, 334 U. S. 131; *Timken Roller Bearing Co.* v. *United States*, 341 U. S. 593.

[63] See note 30, *supra*.

*The Product Market.*

Shoes are sold in the United States in retail shoe stores and in shoe departments of general stores. These outlets sell: (1) men's shoes, (2) women's shoes, (3) women's or children's shoes, or (4) men's, women's or children's shoes. Prior to the merger, both Brown and Kinney sold their shoes in competition with one another through the enumerated kinds of outlets characteristic of the industry.

In Part IV of this opinion we hold that the District Court correctly defined men's, women's, and children's shoes as the relevant lines of commerce in which to analyze the vertical aspects of the merger. For the reasons there stated we also hold that the same lines of commerce are appropriate for considering the horizontal aspects of the merger.

*The Geographic Market.*

The criteria to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market. See S. Rep. No. 1775, 81st Cong., 2d Sess. 5–6; *United States* v. *E. I. du Pont de Nemours & Co.,* 353 U. S. 586, 593. Moreover, just as a product submarket may have § 7 significance as the proper "line of commerce," so may a geographic submarket be considered the appropriate "section of the country." *Erie Sand & Gravel Co.* v. *Federal Trade Comm'n,* 291 F. 2d 279, 283 (C. A. 3d Cir.); *United States* v. *Bethlehem Steel Corp.,* 168 F. Supp. 576, 595–603 (D. C. S. D. N. Y.). Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one. The geographic market selected must, therefore, both "correspond to the commercial realities" [64] of the industry and be economi-

---

[64] *American Crystal Sugar Co.* v. *Cuban-American Sugar Co.,* 152 F. Supp. 387, 398 (D. C. S. D. N. Y.), aff'd, 259 F. 2d 524 (C. A. 2d Cir.); S. Rep. No. 1775, 81st Cong., 2d Sess. 5–6.

cally significant. Thus, although the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area. *United States* v. *Columbia Pictures Corp.,* 189 F. Supp. 153, 193–194 (D. C. S. D. N. Y.); *United States* v. *Maryland & Virginia Milk Producers Assn.,* 167 F. Supp. 799 (D. C. D. C.), affirmed, 362 U. S. 458. The fact that two merging firms have competed directly on the horizontal level in but a fraction of the geographic markets in which either has operated, does not, in itself, place their merger outside the scope of § 7. That section speaks of "any . . . section of the country," and if anticompetitive effects of a merger are probable in "any" significant market, the merger—at least to that extent— is proscribed.[65]

The parties do not dispute the findings of the District Court that the Nation as a whole is the relevant geographic market for measuring the anticompetitive effects of the merger viewed vertically or of the horizontal merger of Brown's and Kinney's manufacturing facilities. As to the retail level, however, they disagree.

The District Court found that the effects of this aspect of the merger must be analyzed in every city with a population exceeding 10,000 and its immediate contiguous surrounding territory in which both Brown and Kinney sold shoes at retail through stores they either owned or controlled.[66] By this definition of the geographic mar-

---

[65] To illustrate: If two retailers, one operating primarily in the eastern half of the Nation, and the other operating largely in the West, competed in but two mid-Western cities, the fact that the latter outlets represented but a small share of each company's business would not immunize the merger in those markets in which competition might be adversely affected. On the other hand, that fact would, of course, be properly considered in determining the equitable relief to be decreed. Cf. *United States* v. *Jerrold Electronics Corp.,* 187 F. Supp. 545 (D. C. E. D. Pa.), aff'd, 365 U. S. 567.

[66] In describing the geographic market in which Brown and Kinney competed, the District Court included cities in which Brown "Fran-

ket, less than one-half of all the cities in which either Brown or Kinney sold shoes through such outlets are represented. The appellant recognizes that if the District Court's characterization of the relevant market is proper, the number of markets in which both Brown and Kinney have outlets is sufficiently numerous so that the validity of the entire merger is properly judged by testing its effects in those markets. However, it is appellant's contention that the areas of effective competition in shoe retailing were improperly defined by the District Court. It claims that such areas should, in some cases, be defined so as to include only the central business districts of large cities, and in others, so as to encompass the "standard metropolitan areas" within which smaller communities are found. It argues that any test failing to distinguish between these competitive situations is improper.

We believe, however, that the record fully supports the District Court's findings that shoe stores in the outskirts of cities compete effectively with stores in central

chise Plan" and "Wohl Plan" stores were located. Although such stores were not owned or directly controlled by Brown, did not sell Brown products exclusively and did not finance inventory through Brown, we believe there was adequate evidence before the District Court to support its finding that such stores were "Brown stores." To such stores Brown provided substantial assistance in the form of merchandising and advertising aids, reports on market and management research, loans, group life and fire insurance and centralized purchase of rubber footwear from manufacturers on Brown's credit. For these services, Brown required the retailer to deal almost exclusively in Brown's products in the price scale at which Brown shoes sold. Further, Brown reserved the power to terminate such franchise agreements on 30 days' notice. Since the retailer was required, under this plan, to invest his own resources and develop his good will to a substantial extent in the sale of Brown products, the flow of which Brown could readily terminate, Brown was able to exercise sufficient control over these stores and departments to warrant their characterization as "Brown" outlets for the purpose of measuring the share and effect of Brown's competition at the retail level. Cf. *Standard Oil Co. of California* v. *United States*, 337 U. S. 293.

downtown areas, and that while there is undoubtedly some commercial intercourse between smaller communities within a single "standard metropolitan area," the most intense and important competition in retail sales will be confined to stores within the particular communities in such an area and their immediate environs.[67]

We therefore agree that the District Court properly defined the relevant geographic markets in which to analyze this merger as those cities with a population exceeding 10,000 and their environs in which both Brown and Kinney retailed shoes through their own outlets. Such markets are large enough to include the downtown shops and suburban shopping centers in areas contiguous to the city, which are the important competitive factors, and yet are small enough to exclude stores beyond the immediate environs of the city, which are of little competitive significance.

*The Probable Effect of the Merger.*

Having delineated the product and geographic markets within which the effects of this merger are to be measured, we turn to an examination of the District Court's finding that as a result of the merger competition in the retailing of men's, women's and children's shoes may be lessened substantially in those cities in which both Brown and Kinney stores are located. We note, initially, that appellant challenges this finding on a number of grounds other than those discussed above and on grounds independent of the critical question of whether competition may, in fact, be lessened. Thus, Brown objects that the District Court did not examine the competitive picture in each line of commerce and each section of the country it had defined as appropriate. It says the Court erred in failing to enter findings with respect to each relevant city assessing

---

[67] The District Court limited its findings to cities having a population of at least 10,000 persons, since Kinney operated only in such areas.

the anticompetitive effect of the merger on the retail sale of, for example, men's shoes in Council Bluffs, men's shoes in Texas City, women's shoes in Texas City and children's shoes in St. Paul. Even assuming a representative sample could properly be used, Brown also objects that the District Court's detailed analysis of competition in shoe retailing was limited to a single city—St. Louis—a city in which Kinney did not operate. The appellant says this analysis could not be sufficiently representative to establish a standard image of the shoe trade which could be applied to each of the more than 100 cities in which Brown and Kinney sold shoes, particularly as some of those cities were much smaller than St. Louis, others were larger, some were in different climates and others were in areas having different median per capita incomes.

However, we believe the record is adequate to support the findings of the District Court. While it is true that the court concentrated its attention on the structure of competition in the city in which it sat and as to which detailed evidence was most readily available, it also heard witnesses from no less than 40 other cities in which the parties to the merger operated. The court was careful to point out that it was on the basis of all the evidence that it reached its conclusions concerning the boundaries of the relevant markets and the merger's effects on competition within them. We recognize that variations of size, climate and wealth as enumerated by Brown exist in the relevant markets. However, we agree with the court below that the markets with respect to which evidence was received provide a fair sampling of all the areas in which the impact of this merger is to be measured. The appellant has not shown how the variables it has mentioned could affect the structure of competition within any particular market so as to require a change in the conclusions drawn by the District Court. Each competitor within a given market is equally affected by these factors, even though the city in which he does busi-

ness may differ from St. Louis in size, climate or wealth. Thus, we believe the District Court properly reached its conclusions on the basis of the evidence available to it. There is no reason to protract already complex antitrust litigation by detailed analyses of peripheral economic facts, if the basic issues of the case may be determined through study of a fair sample.[68]

In the case before us, not only was a fair sample used to demonstrate the soundness of the District Court's conclusions, but evidence of record fully substantiates those findings as to each relevant market. An analysis of undisputed statistics of sales of shoes in the cities in which both Brown and Kinney sell shoes at retail, separated into the appropriate lines of commerce, provides a persuasive factual foundation upon which the required prognosis of the merger's effects may be built. Although Brown objects to some details in the Government's computations used in drafting these exhibits, appellant cannot deny the correctness of the more general picture they reveal.[69] We have appended the exhibits to this opinion.

---

[68] See *Standard Oil Co. of California* v. *United States,* 337 U. S. 293, 313; U. S. Atty. Gen. Nat. Comm. to Study the Antitrust Laws, Report 126 (1955): "While sufficient data to support a conclusion is required, sufficient data to give the enforcement agencies, the courts and business certainty as to competitive consequences would nullify the words 'Where the effect may be' in the Clayton Act and convert them into 'Where the effect is.'" And the Committee of the Judicial Conference of the United States on Procedure in Antitrust and Other Protracted Cases has also emphasized the need for limiting the mass of possibly relevant evidence in cases of this type in order to avoid confusion and its concomitant increased possibility of error. 13 F. R. D. 62, 64.

[69] Brown objects, for example, to the fact that these exhibits are drafted on the basis of the *cities* concerning which census information was available, rather than on the basis of the *cities and their environs*—as the relevant markets were defined by the District Court. However, the record shows that the statistics of shoe sales in cities by and large conform to statistics of shoe sales in counties in which those cities are the principal metropolitan area. See Appendix D,

They show, for example, that during 1955 in 32 separate cities, ranging in size and location from Topeka, Kansas, to Batavia, New York, and Hobbs, New Mexico, the com-

*infra.* Thus, we find no error in a conclusion drawn as to a slightly larger market from the available record of sales in cities alone. Brown also objects to the use of pairage sales, rather than dollar volume, as the basis for defining the size, and measuring Brown's shares, of the market. However, since Brown and Kinney sold shoes primarily in the low and medium price ranges, and in the light of the conceded spread in shoe prices, we agree that sales measured by pairage provide a more accurate picture of the Brown-Kinney shares of the market than do sales measured in dollars. Detailed statistics of shoe sales were available only in terms of dollar volume, however, and Brown objects to the method by which the Government has converted those figures into those reflecting sales in terms of pairage. The Government's conversion was, with some exceptions, based on national median income and national averages of shoe prices and the ratio of men, women and children in the population. The District Court accepted expert testimony offered by the Government to the effect that shoe price and population age, sex and income variations in the relevant cities produced, at most, a 6% error in the converted statistics, and that this error was as likely to favor Brown (by increasing the universe of sales against which Brown's shares were to be measured) as it was to disfavor it. We find no error in the District Court's acceptance of the Government's evidence as to the propriety of the accounting methods its experts employed. Lastly, Brown objects that the statistics concerning its own pairage sales were improperly derived since they included sales by its wholesale distributors to the retail outlets on its franchise plans in the same category as sales to ultimate consumers by its owned retail stores. Again, while recognizing a possible margin of error in statistics combining sales at two levels of distribution, we believe they provide an adequate basis upon which to gauge Brown sales through outlets it controlled. Particularly as the franchise stores were required to finance their own inventory, does it seem reasonable to conclude that most of their purchases from Brown's distributors were eventually resold. In summary, although appellant may point to technical flaws in the compilation of these statistics, we recognize that in cases of this type precision in detail is less important than the accuracy of the broad picture presented. We believe the picture as presented by the Government in this case is adequate for making the determination required by § 7: whether this merger *may* tend to lessen competition substantially in the relevant markets.

bined share of Brown and Kinney sales of women's shoes (by unit volume) exceeded 20%.[70] In 31 cities—some the same as those used in measuring the effect of the merger in the women's line—the combined share of children's shoes sales exceeded 20%; in 6 cities their share exceeded 40%. In Dodge City, Kansas, their combined share of the market for women's shoes was over 57%; their share of the children's shoe market in that city was 49%. In the 7 cities in which Brown's and Kinney's combined shares of the market for women's shoes were greatest (ranging from 33% to 57%) each of the parties alone, prior to the merger, had captured substantial portions of those markets (ranging from 13% to 34%); the merger intensified this existing concentration. In 118 separate cities the combined shares of the market of Brown and Kinney in the sale of one of the relevant lines of commerce exceeded 5%. In 47 cities, their share exceeded 5% in all three lines.

The market share which companies may control by merging is one of the most important factors to be considered when determining the probable effects of the combination on effective competition in the relevant market.[71] In an industry as fragmented as shoe retailing, the control of substantial shares of the trade in a city may have important effects on competition. If a merger achieving

---

[70] Although the sum of the parties' pre-existing shares of the market will normally equal their combined share of the immediate post-merger market, we recognize that this share need not remain stable in the future. Nevertheless, such statistics provide a graphic picture of the immediate impact of a merger, and, as such, also provide a meaningful base upon which to build conclusions of the probable future effects of the merger.

[71] See *United States* v. *E. I. du Pont de Nemours & Co.*, 353 U. S. 586, 595–596; *A. G. Spaulding & Bros.* v. *Federal Trade Comm'n*, 301 F. 2d 585, 612–615 (C. A. 3d Cir.); *United States* v. *Bethlehem Steel Corp.*, 168 F. Supp. 576, 603–611 (D. C. S. D. N. Y.). Cf. Bok, Section 7 of the Clayton Act and the Merging of Law and Economics, 74 Harv. L. Rev. 226, 279, 308–311 (1960).

5% control were now approved, we might be required to approve future merger efforts by Brown's competitors seeking similar market shares. The oligopoly Congress sought to avoid would then be furthered and it would be difficult to dissolve the combinations previously approved. Furthermore, in this fragmented industry, even if the combination controls but a small share of a particular market, the fact that this share is held by a large national chain can adversely affect competition. Testimony in the record from numerous independent retailers, based on their actual experience in the market, demonstrates that a strong, national chain of stores can insulate selected outlets from the vagaries of competition in particular locations and that the large chains can set and alter styles in footwear to an extent that renders the independents unable to maintain competitive inventories. A third significant aspect of this merger is that it creates a large national chain which is integrated with a manufacturing operation. The retail outlets of integrated companies, by eliminating wholesalers and by increasing the volume of purchases from the manufacturing division of the enterprise, can market their own brands at prices below those of competing independent retailers. Of course, some of the results of large integrated or chain operations are beneficial to consumers. Their expansion is not rendered unlawful by the mere fact that small independent stores may be adversely affected. It is competition, not competitors, which the Act protects. But we cannot fail to recognize Congress' desire to promote competition through the protection of viable, small, locally owned businesses. Congress appreciated that occasional higher costs and prices might result from the maintenance of fragmented industries and markets. It resolved these competing considerations in favor of decentralization. We must give effect to that decision.

Other factors to be considered in evaluating the probable effects of a merger in the relevant market lend addi-

tional support to the District Court's conclusion that this merger may substantially lessen competition. One such factor is the history of tendency toward concentration in the industry.[72] As we have previously pointed out, the shoe industry has, in recent years, been a prime example of such a trend. Most combinations have been between manufacturers and retailers, as each of the larger producers has sought to capture an increasing number of assured outlets for its wares. Although these mergers have been primarily vertical in their aim and effect, to the extent that they have brought ever greater numbers of retail outlets within fewer and fewer hands, they have had an additional important impact on the horizontal plane. By the merger in this case, the largest single group of retail stores still independent of one of the large manufacturers was absorbed into an already substantial aggregation of more or less controlled retail outlets. As a result of this merger, Brown moved into second place nationally in terms of retail stores directly owned. Including the stores on its franchise plan, the merger placed under Brown's control almost 1,600 shoe outlets, or about 7.2% of the Nation's retail "shoe stores" as defined by the Census Bureau,[73] and 2.3% of the Nation's total retail

---

[72] See note 38, *supra.* A company's history of expansion through mergers presents a different economic picture than a history of expansion through unilateral growth. Internal expansion is more likely to be the result of increased demand for the company's products and is more likely to provide increased investment in plants, more jobs and greater output. Conversely, expansion through merger is more likely to reduce available consumer choice while providing no increase in industry capacity, jobs or output. It was for these reasons, among others, Congress expressed its disapproval of successive acquisitions. Section 7 was enacted to prevent even small mergers that added to concentration in an industry. See S. Rep. No. 1775, 81st Cong., 2d Sess. 5. Cf. *United States* v. *Jerrold Electronics Corp.,* 187 F. Supp. 545, 566 (D. C. E. D. Pa.) aff'd, 365 U. S. 567; *United States* v. *Bethlehem Steel Corp.,* 168 F. Supp. 576, 606 (D. C. S. D. N. Y.).

[73] See note 5, *supra.*

shoe outlets.[74] We cannot avoid the mandate of Congress that tendencies toward concentration in industry are to be curbed in their incipiency, particularly when those tendencies are being accelerated through giant steps striding across a hundred cities at a time. In the light of the trends in this industry we agree with the Government and the court below that this is an appropriate place at which to call a halt.

At the same time appellant has presented no mitigating factors, such as the business failure or the inadequate resources of one of the parties that may have prevented it from maintaining its competitive position, nor a demonstrated need for combination to enable small companies to enter into a more meaningful competition with those dominating the relevant markets. On the basis of the record before us, we believe the Government sustained its burden of proof. We hold that the District Court was correct in concluding that this merger may tend to lessen competition substantially in the retail sale of men's, women's, and children's shoes in the overwhelming majority of those cities and their environs in which both Brown and Kinney sell through owned or controlled outlets.

The judgment is

*Affirmed.*

Mr. Justice Frankfurter took no part in the decision of this case.

Mr. Justice White took no part in the consideration or decision of this case.

---

[74] Although statistics concerning the degree of concentration and the rank of Brown-Kinney in terms of controlled retail stores in each of the relevant product and geographic markets would have been more helpful in analyzing the results of this merger, neither side has presented such statistics. The figures in the record, based on national rank, are, nevertheless, useful in depicting the trends in the industry.

# APPENDIX A

*Sales of women's shoes by Brown and Kinney as a share of the total city sales in selected areas (1955)*

| Area | Total sales (pairs) | Kinney Shoe Store (%) | Brown owned or controlled outlets (%)* | Combined Brown-Kinney share (%)* |
|---|---|---|---|---|
| Dodge City, Kans | 31,400 | 23.3 | 34.4 | 57.7 |
| Texas City, Tex | 32,300 | 27.8 | 20.7 | 48.5 |
| Council Bluffs, Iowa | 68,200 | 27.3 | 15.4 | 42.7 |
| Marshalltown, Iowa | 72,600 | 21.8 | 13.4 | 35.2 |
| Uniontown, Pa | 144,900 | 16.3 | 18.8 | 35.1 |
| Ardmore, Okla | 62,600 | 14.4 | 20.3 | 34.7 |
| Keokuk, Iowa | 34,600 | 18.4 | 14.8 | 33.2 |
| Ottumwa, Iowa | 67,200 | 28.2 | 4.3 | 32.5 |
| Pine Bluff, Ark | 63,100 | 21.6 | 9.4 | 31.0 |
| Lawton, Okla | 95,200 | 20.2 | 9.8 | 30.0 |
| Borger, Tex | 50,100 | 15.5 | 13.8 | 29.3 |
| Roswell, N. Mexico | 80,900 | 11.7 | 15.8 | 27.5 |
| Topeka, Kans | 224,000 | 11.7 | 15.8 | 27.5 |
| Coatesville, Pa | 46,200 | 17.2 | 10.0 | 27.2 |
| Hobbs, N. Mexico | 50,800 | 22.2 | 5.0 | 27.2 |
| Iowa City, Iowa | 72,200 | 15.3 | 10.7 | 26.0 |
| Dubuque, Iowa | 119,000 | 14.3 | 11.5 | 25.8 |
| Carlisle, Pa | 55,500 | 17.5 | 5.9 | 23.4 |
| Texarkana, Ark | 65,800 | 15.9 | 7.5 | 23.4 |
| Fort Dodge, Iowa | 104,000 | 10.8 | 12.5 | 23.3 |
| Steubenville, Ohio | 207,200 | 14.9 | 8.1 | 23.0 |
| Mason City, Iowa | 102,400 | 14.4 | 8.3 | 22.7 |
| Marion, Ohio | 91,600 | 6.7 | 15.7 | 22.4 |
| Pueblo, Colo | 152,400 | 14.1 | 7.5 | 21.6 |
| Hibbing, Minn | 44,600 | 18.1 | 3.4 | 21.5 |
| Fargo, N. Dak | 162,800 | 15.3 | 6.2 | 21.5 |
| Franklin, Pa | 32,100 | 14.4 | 7.1 | 21.5 |
| Corpus Christi, Tex | 331,500 | 2.4 | 19.0 | 21.4 |
| Batavia, N.Y | 75,300 | 13.2 | 8.1 | 21.3 |
| McAllen, Tex | 90,200 | 13.0 | 8.3 | 21.3 |
| Concord, N.H | 57,300 | 15.6 | 4.7 | 20.3 |
| Sioux City, Iowa | 222,000 | 7.7 | 12.3 | 20.0 |
| Muskogee, Okla | 68,100 | 7.6 | 12.2 | 19.8 |
| Rochester, Minn | 130,100 | 11.2 | 8.6 | 19.8 |
| Bartlesville, Okla | 63,100 | 15.8 | 3.9 | 19.7 |
| Berwyn, Ill | 95,900 | 17.8 | 1.9 | 19.7 |
| Clarksburg, W. Va | 134,600 | 15.5 | 3.9 | 19.4 |
| Davenport, Iowa | 230,300 | 6.4 | 12.8 | 19.2 |
| Freeport, Ill | 88,000 | 10.7 | 8.3 | 19.0 |
| Grand Forks, N. Dak | 121,100 | 12.8 | 6.1 | 18.9 |
| Muskegon, Mich | 172,000 | 4.0 | 14.9 | 18.9 |
| Baton Rouge, La | 398,100 | 3.8 | 14.9 | 18.7 |
| Des Moines, Iowa | 562,800 | 4.9 | 13.8 | 18.7 |

* The percentages in these columns reflect sales of Brown brand shoes through Brown owned or controlled outlets.

| Area | Total sales (pairs) | Kinney Shoe Store (%) | Brown owned or controlled outlets (%) * | Combined Brown-Kinney share (%) * |
|---|---|---|---|---|
| Springfield, Mo | 210,400 | 3.7 | 14.9 | 18.6 |
| Laredo, Tex | 166,200 | 15.3 | 3.2 | 18.5 |
| St. Cloud, Minn | 88,400 | 9.6 | 8.9 | 18.5 |
| Fort Smith, Ark | 165,200 | 11.8 | 6.5 | 18.3 |
| Kingsport, Tenn | 106,200 | 13.0 | 5.1 | 18.1 |
| Gulfport, Miss | 99,700 | 14.2 | 3.7 | 17.9 |
| Cortland, N.Y | 55,300 | 12.2 | 5.5 | 17.7 |
| Fremont, Nebr | 56,100 | 11.8 | 5.6 | 17.4 |
| Manitowoc, Wis | 60,800 | 13.9 | 3.5 | 17.4 |
| Salina, Kans | 102,800 | 13.8 | 3.3 | 17.1 |
| Muncie, Ind | 158,000 | 7.9 | 9.0 | 16.9 |
| Portsmouth, Ohio | 141,200 | 9.2 | 7.2 | 16.4 |
| Reading, Pa | 417,200 | 6.0 | 10.4 | 16.4 |
| Greensburg, Pa | 117,800 | 8.0 | 7.9 | 15.9 |
| Little Rock, Ark | 468,100 | 2.7 | 13.2 | 15.9 |
| Flint, Mich | 628,300 | 2.7 | 13.1 | 15.8 |
| Wichita, Kans | 666,600 | 7.5 | 8.3 | 15.8 |
| Lubbock, Tex | 305,500 | 3.9 | 11.7 | 15.6 |
| Kingston, N.Y | 112,100 | 11.6 | 3.9 | 15.5 |
| Emporia, Kans | 44,300 | 14.3 | 0.8 | 15.1 |
| Johnson City, Tenn | 75,800 | 12.0 | 3.1 | 15.1 |
| Odessa, Tex | 167,700 | 8.1 | 7.0 | 15.1 |
| Bloomington, Ill | 129,600 | 6.2 | 8.6 | 14.8 |
| Elgin, Ill | 126,900 | 6.7 | 8.0 | 14.7 |
| Enid, Okla | 140,400 | 10.7 | 4.0 | 14.7 |
| Burlington, Iowa | 74,500 | 10.7 | 3.9 | 14.6 |
| South Bend, Ind | 434,500 | 1.6 | 13.0 | 14.6 |
| Galesburg, Ill | 95,600 | 12.4 | 2.1 | 14.5 |
| Abilene, Tex | 184,300 | 12.4 | 2.0 | 14.4 |
| Meridian, Miss | 120,000 | 3.7 | 10.6 | 14.3 |
| Toledo, Ohio | 821,800 | 1.3 | 12.6 | 13.9 |
| Tulsa, Okla | 749,000 | 7.0 | 6.9 | 13.9 |
| Colorado Springs, Colo | 225,600 | 7.5 | 6.1 | 13.6 |
| Williamsport, Pa | 153,400 | 4.1 | 9.2 | 13.3 |
| Mankato, Minn | 99,900 | 7.9 | 5.3 | 13.2 |
| Green Bay, Wis | 220,000 | 7.5 | 5.2 | 12.7 |
| Waterloo, Iowa | 224,100 | 10.2 | 2.3 | 12.5 |
| Sioux Falls, S. Dak | 172,000 | 7.4 | 4.9 | 12.3 |
| Glens Falls, N.Y | 115,300 | 7.6 | 4.6 | 12.2 |
| Kansas City, Kans | 181,300 | 8.6 | 3.6 | 12.2 |
| Oklahoma City, Okla | 839,500 | 1.8 | 10.4 | 12.2 |
| Hutchinson, Kans | 156,400 | 9.0 | 2.4 | 11.4 |
| Kenosha, Wis | 107,700 | 7.0 | 4.3 | 11.3 |
| Pottsville, Pa | 147,000 | 6.0 | 5.3 | 11.3 |
| San Angelo, Tex | 113,800 | 6.5 | 4.6 | 11.1 |
| Wheeling, W. Va | 311,600 | 6.9 | 3.9 | 10.8 |
| Ithaca, N.Y | 82,300 | 5.8 | 4.7 | 10.5 |
| Zanesville, Ohio | 138,800 | 9.0 | 1.5 | 10.5 |
| Mobile, Ala | 473,100 | 1.0 | 9.4 | 10.4 |

* See footnote on p. 347.

| Area | Total sales (pairs) | Kinney Shoe Store (%) | Brown owned or controlled outlets (%) * | Combined Brown-Kinney share (%) * |
|---|---|---|---|---|
| York, Pa | 344, 200 | 5. 1 | 4. 9 | 10. 0 |
| Gary, Ind | 414, 400 | 4. 3 | 5. 3 | 9. 6 |
| Decatur, Ill | 221, 800 | 3. 9 | 5. 5 | 9. 4 |
| Amarillo, Tex | 334, 100 | 5. 6 | 3. 2 | 8. 8 |
| Minneapolis, Minn | 1, 909, 900 | 5. 3 | 3. 1 | 8. 4 |
| Fort Worth, Tex | 1, 092, 100 | 1. 4 | 6. 9 | 8. 3 |
| Waco, Tex | 170, 400 | 5. 4 | 2. 9 | 8. 3 |
| Altoona, Pa | 241, 000 | 4. 8 | 3. 3 | 8. 1 |
| Lancaster, Pa | 316, 400 | 3. 9 | 4. 2 | 8. 1 |
| Rockford, Ill | 377, 400 | 5. 0 | 3. 1 | 8. 1 |
| Saginaw, Mich | 326, 300 | 2. 1 | 5. 6 | 7. 7 |
| Grand Rapids, Mich | 650, 300 | 5. 8 | 1. 6 | 7. 4 |
| Jacksonville, Fla | 739, 200 | 0. 6 | 6. 7 | 7. 3 |
| Columbus, Ga | 308, 300 | 3. 4 | 3. 5 | 6. 9 |
| Evansville, Ind | 486, 600 | 3. 1 | 3. 6 | 6. 7 |
| St. Paul, Minn | 1, 013, 200 | 3. 1 | 3. 5 | 6. 6 |
| Montgomery, Ala | 437, 100 | 1. 7 | 4. 7 | 6. 4 |
| Peoria, Ill | 469, 300 | 3. 6 | 2. 8 | 6. 4 |
| Springfield, Ill | 304, 400 | 5. 1 | 1. 3 | 6. 4 |
| Milwaukee, Wis | 1, 984, 900 | 5. 9 | 0. 3 | 6. 2 |
| San Antonio, Tex | 1, 476, 000 | 1. 0 | 4. 7 | 5. 7 |
| Cedar Rapids, Iowa | 256, 600 | 3. 9 | 1. 2 | 5. 1 |

* See footnote on p. 347.

Source: GX 9, 214, R. 60-70, 1223-1227; DX RR, DDDD-1, DDDD-2, R. 3892-4315, 4939-5299, 5300-5652.

# 350

# APPENDIX B

*Sales of children's shoes by Brown and Kinney as a share of the total city sales in selected areas (1955)*

| Area | Total sales (pairs) | Kinney Shoe Store (%) | Brown owned or controlled outlets (%)* | Combined Brown-Kinney share (%)* |
|---|---|---|---|---|
| Coatesville, Pa. | 20,900 | 20.8 | 31.0 | 51.8 |
| Dodge City, Kans. | 14,200 | 35.5 | 13.5 | 49.0 |
| Council Bluffs, Iowa | 30,900 | 36.6 | 6.5 | 43.1 |
| Ardmore, Okla. | 28,400 | 20.7 | 21.0 | 41.7 |
| Pueblo, Colo. | 69,100 | 25.4 | 15.8 | 41.2 |
| Borger, Tex. | 22,700 | 24.8 | 16.1 | 40.9 |
| Berwyn, Ill. | 43,500 | 31.2 | 3.4 | 34.6 |
| Batavia, N.Y. | 34,100 | 14.0 | 19.3 | 33.3 |
| Ottumwa, Iowa | 30,500 | 30.4 | 2.5 | 32.9 |
| Carlisle, Pa. | 25,200 | 21.4 | 11.3 | 32.7 |
| Manitowoc, Wis. | 27,600 | 19.2 | 12.1 | 31.3 |
| Lawton, Okla. | 43,200 | 18.3 | 12.6 | 30.9 |
| Franklin, Pa. | 14,500 | 14.4 | 14.9 | 29.3 |
| Gulfport, Miss. | 45,200 | 24.5 | 4.5 | 29.0 |
| Fremont, Nebr. | 25,400 | 14.3 | 14.6 | 28.9 |
| Bartlesville, Okla. | 28,600 | 20.7 | 7.8 | 28.5 |
| Concord, N.H. | 26,000 | 16.3 | 11.8 | 28.1 |
| Uniontown, Pa. | 65,700 | 18.9 | 8.3 | 27.2 |
| Marshalltown, Iowa | 32,900 | 22.8 | 4.2 | 27.0 |
| Cortland, N.Y. | 25,100 | 13.8 | 12.4 | 26.2 |
| Kingsport, Tenn. | 48,100 | 14.8 | 10.6 | 25.4 |
| McAllen, Tex. | 40,000 | 17.0 | 7.5 | 24.5 |
| Topeka, Kans. | 101,600 | 15.7 | 7.2 | 22.9 |
| Texarkana, Ark. | 29,800 | 19.2 | 3.6 | 22.8 |
| Johnson City, Tenn. | 34,300 | 13.0 | 9.4 | 22.4 |
| Dubuque, Iowa | 53,900 | 17.6 | 4.5 | 22.1 |
| Emporia, Kans. | 20,100 | 14.5 | 7.4 | 21.9 |
| Iowa City, Iowa | 32,700 | 15.8 | 5.8 | 21.6 |
| Muskogee, Okla. | 30,900 | 10.7 | 10.9 | 21.6 |
| Salina, Kans. | 46,600 | 12.5 | 8.7 | 21.2 |
| Mason City, Iowa | 46,400 | 16.8 | 3.4 | 20.2 |
| Enid, Okla. | 63,700 | 12.1 | 6.9 | 19.0 |
| Kingston, N.Y. | 50,800 | 12.8 | 5.1 | 17.9 |
| Rochester, Minn. | 59,100 | 7.5 | 9.9 | 17.4 |
| Ithaca, N.Y. | 37,300 | 5.5 | 11.8 | 17.3 |
| Hutchinson, Kans. | 70,900 | 10.9 | 6.0 | 16.9 |
| Baton Rouge, La. | 180,400 | 8.0 | 8.6 | 16.6 |
| Grand Forks, N. Dak. | 54,900 | 12.7 | 3.4 | 16.1 |
| Sioux City, Iowa | 100,600 | 9.8 | 5.9 | 15.7 |
| Altoona, Pa. | 109,300 | 12.5 | 2.9 | 15.4 |
| Elgin, Ill. | 57,500 | 13.1 | 2.3 | 15.4 |

*The percentages in these columns reflect sales of Brown brand shoes through Brown owned or controlled outlets, with the single exception of Manitowoc, Wis., in which case they reflect the sale of Brown brand shoes through all outlets, regardless of ownership or control, and are, therefore, marginally too high.

| Area | Total sales (pairs) | Kinney Shoe Store (%) | Brown owned or controlled outlets (%) * | Combined Brown-Kinney share (%) * |
|---|---|---|---|---|
| Meridian, Miss | 54,400 | 6.7 | 8.7 | 15.4 |
| Wichita, Kans | 302,200 | 9.6 | 5.6 | 15.2 |
| Colorado Springs, Colo | 102,300 | 8.0 | 7.1 | 15.1 |
| Fort Smith, Ark | 74,900 | 12.1 | 3.0 | 15.1 |
| Fort Dodge, Iowa | 47,100 | 12.5 | 2.4 | 14.9 |
| Zanesville, Ohio | 62,900 | 9.7 | 4.8 | 14.5 |
| Muskegon, Mich | 78,000 | 7.4 | 6.6 | 14.0 |
| Steubenville, Ohio | 93,900 | 11.4 | 2.4 | 13.8 |
| Tulsa, Okla | 339,500 | 8.6 | 5.2 | 13.8 |
| Corpus Christi, Tex | 150,300 | 4.4 | 8.8 | 13.2 |
| Davenport, Iowa | 104,400 | 8.4 | 4.8 | 13.2 |
| Fargo, N. Dak | 73,800 | 9.0 | 3.8 | 12.8 |
| Wheeling, W. Va | 141,200 | 8.7 | 4.1 | 12.8 |
| Amarillo, Tex | 151,400 | 8.5 | 4.2 | 12.7 |
| Little Rock, Ark | 212,200 | 3.0 | 9.5 | 12.5 |
| South Bend, Ind | 197,000 | 2.9 | 9.4 | 12.3 |
| Greensburg, Pa | 53,400 | 8.9 | 3.0 | 11.9 |
| Des Moines, Iowa | 225,100 | 6.5 | 5.1 | 11.6 |
| Glens Falls, N.Y | 52,300 | 10.2 | 1.2 | 11.4 |
| Green Bay, Wis | 99,700 | 7.3 | 3.8 | 11.1 |
| Decatur, Ill | 100,500 | 6.3 | 4.4 | 10.7 |
| Fort Worth, Tex | 495,100 | 3.3 | 7.4 | 10.7 |
| Mobile, Ala | 198,100 | 4.5 | 6.2 | 10.7 |
| Gary, Ind | 187,800 | 7.0 | 3.6 | 10.6 |
| Bloomington, Ill | 58,800 | 6.5 | 4.0 | 10.5 |
| Springfield, Mo | 95,400 | 3.1 | 6.5 | 9.6 |
| Willamsport, Pa | 69,600 | 5.0 | 4.5 | 9.5 |
| Waco, Tex | 77,200 | 6.3 | 3.2 | 9.5 |
| Lubbock, Tex | 138,500 | 6.4 | 2.8 | 9.2 |
| Pottsville, Pa | 66,600 | 5.9 | 3.3 | 9.2 |
| Milwaukee, Wis | 899,800 | 8.3 | 0.4 | 8.7 |
| Lancaster, Pa | 143,400 | 6.2 | 2.3 | 8.5 |
| Tampa, Fla | 251,600 | 4.5 | 4.0 | 8.5 |
| Oklahoma City, Okla | 380,600 | 2.5 | 5.8 | 8.3 |
| Mankato, Minn | 45,300 | 8.9 | 1.1 | 7.9 |
| Minneapolis, Minn | 865,800 | 6.7 | 1.2 | 7.9 |
| Peoria, Ill | 212,700 | 6.7 | 1.0 | 7.7 |
| Columbus, Ga | 139,700 | 6.4 | 1.2 | 7.6 |
| Reading, Pa | 189,100 | 4.4 | 3.1 | 7.5 |
| Toledo, Ohio | 372,500 | 1.5 | 5.3 | 6.8 |
| Jacksonville, Fla | 335,100 | 2.0 | 4.5 | 6.5 |
| Springfield, Ill | 558,500 | 5.7 | 0.7 | 6.4 |
| Montgomery, Ala | 164,500 | 3.3 | 2.9 | 6.2 |
| Brownsville, Tex | 100,500 | 4.3 | 1.8 | 6.1 |
| Saginaw, Mich | 147,900 | 3.5 | 2.5 | 6.0 |
| St. Paul, Minn | 459,300 | 2.7 | 2.5 | 5.2 |
| Detroit, Mich | 2,483,900 | 4.4 | 0.6 | 5.0 |

* See footnote on p. 350.

Source: GX 9, 214, R. 60-70, 1228-1232; DX RR, DDDD-1, DDDD-2, R. 3892-4315, 4939-5299, 5300-5652.

# APPENDIX C

*Sales of men's shoes by Brown and Kinney as a share of the total city sales in selected areas (1955)*

| Area | Total sales (pairs) | Kinney Shoe Store (%) | Brown owned or controlled outlets (%)* | Combined Brown-Kinney share (%)* |
|---|---|---|---|---|
| Dodge City, Kans | 12,000 | 16.4 | 8.4 | 24.8 |
| Ardmore, Okla | 23,900 | 8.1 | 15.5 | 23.6 |
| Batavia, N.Y | 28,700 | 8.9 | 11.3 | 20.2 |
| Lawton, Okla | 36,300 | 11.3 | 8.2 | 19.5 |
| Borger, Tex | 19,100 | 11.5 | 7.8 | 19.3 |
| Pueblo, Colo | 58,100 | 8.6 | 10.3 | 18.9 |
| Carlisle, Pa | 21,200 | 14.3 | 4.2 | 18.5 |
| Fremont, Nebr | 21,400 | 8.0 | 10.4 | 18.4 |
| Coatesville, Pa | 17,600 | 9.3 | 8.2 | 17.5 |
| Manitowoc, Wis | 23,200 | 10.1 | 7.3 | 17.4 |
| Franklin, Pa | 12,200 | 10.5 | 5.3 | 15.8 |
| Council Bluffs, Iowa | 26,000 | 14.0 | 1.1 | 15.1 |
| Concord, N.H | 21,900 | 11.0 | 3.7 | 14.7 |
| Texarkana, Ark | 25,100 | 12.1 | 2.6 | 14.7 |
| Corpus Christi, Tex | 126,500 | 2.0 | 12.3 | 14.3 |
| Muskogee, Okla | 26,000 | 6.5 | 7.6 | 14.1 |
| Emporia, Kans | 16,900 | 7.8 | 5.7 | 13.5 |
| Kingsport, Tenn | 40,500 | 7.2 | 5.9 | 13.1 |
| Bartlesville, Okla | 24,100 | 8.9 | 4.1 | 13.0 |
| Cortland, N.Y | 21,100 | 7.6 | 5.2 | 12.8 |
| Dubuque, Iowa | 45,400 | 10.2 | 2.1 | 12.3 |
| McAllen, Tex | 34,400 | 8.4 | 3.5 | 11.9 |
| Berwyn, Ill | 36,600 | 9.1 | 2.6 | 11.7 |
| Salina, Kans | 39,200 | 7.2 | 3.9 | 11.1 |
| Kingston, N.Y | 42,800 | 6.9 | 3.7 | 10.6 |
| Elgin, Ill | 48,400 | 10.1 | 0.4 | 10.5 |
| Enid, Okla | 53,600 | 5.9 | 4.6 | 10.5 |
| Uniontown, Pa | 55,300 | 7.3 | 2.9 | 10.2 |
| Rochester, Minn | 49,600 | 4.3 | 5.5 | 9.8 |
| Fort Smith, Ark | 63,000 | 5.2 | 4.5 | 9.7 |
| Topeka, Kans | 85,500 | 9.0 | 0.5 | 9.5 |
| Hutchinson, Kans. | 59,700 | 5.1 | 3.7 | 8.8 |
| Johnson City, Tenn | 28,900 | 7.7 | 1.0 | 8.7 |
| Davenport, Iowa | 87,900 | 6.0 | 1.7 | 7.7 |
| Ithaca, N.Y | 31,400 | 3.5 | 4.2 | 7.7 |
| Zanesville, Ohio | 53,000 | 5.2 | 2.1 | 7.3 |
| Muskegon, Mich | 65,600 | 5.1 | 1.7 | 6.8 |
| Steubenville, Ohio | 79,000 | 5.7 | 1.1 | 6.8 |
| Springfield, Mo | 80,300 | 3.6 | 2.8 | 6.4 |

*The percentages in these columns reflect sales of Brown brand shoes through Brown owned or controlled outlets, with the single exception of Concord, N.H., in which case they reflect the sale of Brown brand shoes through all outlets, regardless of ownership or control, and are, therefore, marginally too high.

| Area | Total sales (pairs) | Kinney Shoe Store (%) | Brown owned or controlled outlets (%)* | Combined Brown-Kinney share (%)* |
|---|---|---|---|---|
| Amarillo, Tex | 127,400 | 4.6 | 1.3 | 5.9 |
| Asheville, N.C | 80,900 | 2.9 | 2.9 | 5.8 |
| Green Bay, Wis | 83,900 | 4.0 | 1.6 | 5.6 |
| Waco, Tex | 65,000 | 2.6 | 3.0 | 5.6 |
| Greensburg, Pa | 44,900 | 4.4 | 1.0 | 5.4 |
| Peoria, Ill | 179,000 | 4.7 | 0.7 | 5.4 |
| Reading, Pa | 159,200 | 2.7 | 2.6 | 5.3 |
| Wichita, Kans | 254,300 | 4.3 | 0.9 | 5.2 |
| Colorado Springs, Colo | 86,100 | 4.4 | 0.7 | 5.1 |

* See footnote on p. 352.

Source: GX 9, 214, R. 60-70, 1219-1222; DX RR, DDDD-1, DDDD-2, R. 3892-4315, 4939-5299, 5300-5652.

# APPENDIX D

*Comparison of Brown-Kinney percentage of industry shoe sales for selected cities, and counties or standard metropolitan areas*

[Appellant's percentages of 1954 dollar sales adjusted to include sales of Brown franchise and Wohl plan stores]

| City | City percentage [1] | County or SMA percentage [2] | | |
| | | Name | SMA | County |
| --- | --- | --- | --- | --- |
| Texas City, Tex | 35.8 | Galveston, Tex | 12.2 | |
| Coatesville, Pa | 32.9 | Philadelphia, Pa | 1.9 | |
| Ottumwa, Iowa | 27.3 | Wapello County | | 26.5 |
| Uniontown, Pa. | 27.2 | Fayette County | | 12.4 |
| Texarkana, Ark | 25.3 | Miller County | | 23.9 |
| Marshalltown, Iowa | 24.9 | Marshall County | | 22.6 |
| Council Bluffs, Iowa | 24.2 | Omaha, Nebr | 7.9 | |
| Corpus Christi, Tex | 24.0 | Corpus Christi, Tex | 22.6 | |
| Ardmore, Okla | 23.4 | Carter County | | 20.4 |
| Iowa City, Iowa | 18.9 | Johnson County | | 16.6 |
| Muskogee, Okla | 17.7 | Muskogee County | | 16.5 |
| Steubenville, Ohio | 17.5 | Wheeling-Steubenville | 8.7 | |
| Grand Forks, N. Dak | 17.1 | Grand Forks County | | 14.4 |
| Mason City, Iowa | 16.6 | Cerro Gordo County | | 15.6 |
| Topeka, Kans | 16.4 | Topeka, Kans | 16.1 | |
| Baton Rouge, La | 16.0 | Baton Rouge, La | 15.9 | |
| Rochester, Minn | 15.9 | Rochester, Minn | 15.4 | |
| Dubuque, Iowa | 15.4 | Dubuque, Iowa | 13.9 | |
| Fort Smith, Ark | 15.4 | Fort Smith, Ark | 14.7 | |
| Little Rock, Ark | 15.2 | Little Rock & North Little Rock, Ark | 13.2 | |
| Fort Dodge, Iowa | 14.8 | Webster County | | 14.3 |
| Springfield, Mo | 14.3 | Springfield, Mo | 13.3 | |
| Berwyn, Ill | 14.1 | Chicago, Ill | 2.5 | |
| Davenport, Iowa | 14.1 | Davenport, Moline, Rock Island | 12.2 | |
| Fargo, N. Dak | 13.9 | Cass County | | 13.5 |
| Altoona, Pa | 13.1 | Altoona, Pa | 10.6 | |
| Muskegon, Mich | 13.1 | Muskegon County | | 12.0 |
| Reading, Pa | 12.2 | Reading, Pa | 10.7 | |
| South Bend, Ind | 11.9 | South Bend, Ind | 11.1 | |
| Greensburg, Pa | 11.3 | Pittsburgh, Pa | 2.5 | |
| Bloomington, Ill | 11.0 | McLean County | | 9.8 |
| Kansas City, Kans | 10.7 | Kansas City, Mo | 3.1 | |
| Colorado Springs, Colo | 10.6 | El Paso County | | 10.5 |
| Elgin, Ill | 10.5 | Chicago, Ill | 2.5 | |
| Oklahoma City, Okla | 10.0 | Oklahoma City, Okla | 10.1 | |

[1] Based on dollar values from DX DDDD-1, DDDD-2, NNNN, UUUUUU, R. 4939–5299, R. 5300–5652, 5780–5818, 7155–7313; GX 241D, R. 2014–2365.

[2] Total area dollar estimates of footwear sales from GX 242, R. 2807–2819, and DX UUUUUU, R. 7155–7313. Area dollar sales of footwear by Brown and Kinney owned or controlled outlets from DDDD-1, DDDD-2, NNNN, UUUUUU, R. 4939–5299, 5300–5652, 5780–5818, 7155–7313; GX241D, R. 2014–2365.

MR. JUSTICE CLARK, concurring.

I agree that so long as the Expediting Act, 15 U. S. C. § 29, is on the books we have no alternative but to accept jurisdiction in this case. The Act declares that appeals in civil antitrust cases in which the United States is complainant lie only to this Court. It thus deprives the parties of an intermediate appeal and this Court of the benefit of consideration by a Court of Appeals. Under our system a party should be entitled to at least one appellate review, and since the sole opportunity in cases under the Expediting Act is in this Court we usually note jurisdiction. A fair consideration of the issues requires us to carry out the function of a Court of Appeals by examining the whole record and resolving all questions, whether or not they are substantial. This is a great burden on the Court and seldom results in much expedition, as in this case where 2½ years have passed since the District Court's decision.

On the merits the case presents the question of whether, under § 7 of the Clayton Act, the acquisition by Brown of the Kinney retail stores may substantially lessen competition in shoes on a national basis or in any section of the country.* To me § 7 is definite and clear. It prohibits acquisitions, either of stock or assets, where competition in *any* line of commerce in *any* section of the country may be substantially lessened. The test as stated in the Senate Report on the bill is whether there is "a reasonable probability" that competition *may* be lessened.

An analysis of the record indicates (1) that Brown, which makes all types of shoes, is the fourth largest manufacturer in the country; (2) that Kinney likewise manufactures some shoes but deals primarily in retailing, having almost 400 stores that handle a substantial volume

*Since the judgment below can be supported on this theory, there is no need to inquire into any tendency to create a monopoly.

of sales; (3) that its acquisition would give Brown a total of some 1,600 retail outlets, making it the second largest retailer in the Nation; (4) that Kinney's stores are on both a national and local basis strategically placed from a retail market standpoint in suburban areas or towns of over 10,000 population; (5) that Kinney's suppliers are small shoe manufacturers; (6) that Brown's earlier acquisitions, seven in number in five years, indicate a pattern to increase the sale of Brown shoes through the acquisition of independent outlets, resulting in the loss of sales by small competing manufacturers; (7) that statistics on these outlets indicate that Brown, after acquisition, has materially increased its shipments of Brown shoes to them, some as much as 50%; and (8) that the acquisition would have a direct effect on the small manufacturers who previously enjoyed the Kinney requirements market.

It would appear that the relevant line of commerce would be shoes of all types. This is emphasized by the nature of Brown's manufacturing activity and its plan to integrate the Kinney stores into its operations. The competition affected thereby would be in the line handled by these stores which is the full line of shoes manufactured by Brown. This conclusion is more in keeping with the record as I read it and at the same time avoids the charge of splintering the product line. Likewise, the location of the Kinney stores points more to a national market in shoes than a number of regional markets staked by artificial municipal boundaries. Brown's business is on a national scale and its policy of integration of manufacturing and retailing is on that basis. I would conclude, therefore, that it would be more reasonable to define the line of commerce as shoes—those sold in the ordinary retail store—and the market as the entire country.

On this record but one conclusion can follow, *i. e.,* that the acquisition by Brown of the 400 Kinney stores for the purposes of integrating their operation into its manufacturing activity created a "reasonable probability" that competition in the manufacture and sale of shoes on a national basis might be substantially lessened. I would therefore affirm.

MR. JUSTICE HARLAN, dissenting in part and concurring in part.

I would dismiss this appeal for lack of jurisdiction, believing that the case in its present posture is prematurely here because the judgment sought to be reviewed is not yet final. Since the Court, however, holds that the case is properly before us, I consider it appropriate, after noting my dissent to this holding, to express my views on the merits because the issues are of great importance. On that aspect, I concur in the judgment of the Court but do not join its opinion, which I consider to go far beyond what is necessary to decide the case.

JURISDICTION.

The Court's authority to entertain this appeal depends on § 2 of the Expediting Act of 1903. That statute, in its present form, provides (15 U. S. C. § 29):

"In every civil action brought in any district court of the United States under any of said [antitrust] Acts, wherein the United States is complainant, an appeal from the *final* judgment of the district court will lie *only* to the Supreme Court." (Emphasis added.)

The Act was passed by a Congress which thereby "sought . . . to ensure speedy disposition of suits in equity brought by the United States under the Anti-

Trust Act." *United States* v. *California Cooperative Canneries,* 279 U. S. 553, 558. This major policy consideration emerges clearly from the otherwise meager legislative history of the Act. See H. R. Rep. No. 3020, 57th Cong., 2d Sess. (1903); 36 Cong. Rec. 1679, 1744, 1747. It was in keeping with this purpose that "Congress limited the right of review to an appeal from the decree which disposed of all matters . . . and . . . precluded the possibility of an appeal to either [the Supreme Court or the Court of Appeals] . . . from an interlocutory decree." *United States* v. *California Cooperative Canneries, supra.* For it was entirely consistent with its desire to expedite these cases for Congress to have eliminated the time-consuming delays occasioned by interlocutory appeals either to intermediate courts or to this Court.

By taking jurisdiction over this appeal at the present time, despite the fact that, even if affirmed, this case would doubtless reappear on the Court's docket if the terms of the District Court's divestiture decree are unsatisfactory to the appellant or to the Government, the Court is paving the way for dual appeals in all government antitrust cases where intricate divestiture judgments are involved. Whether or not such a procedure is advisable from the standpoint of judicial administration or practical business considerations—and I think such questions by no means free from doubt—I believe that it is contrary to the provisions and purposes of the Expediting Act, and that the construction now given the Act does violence to the accepted meaning of "final judgment" in the federal judicial system.

The judgment from which this appeal is taken directs the appellant to "relinquish and dispose of the stock, share capital and assets" of the G. R. Kinney Company and enjoins further interlocking interests between the two corporations. It does not specify how the divestiture is to be carried out, but directs appellant to file "a proposed

plan to carry into effect the divestiture order".and grants the Government 30 days following such filing in which to submit "opposition or suggestions thereto." When considered in light of the District Court's opinion, this reservation emerges as much more than a mere retention of jurisdiction for the purpose of ministerially executing a definite and precise final judgment. See, *e. g., Ray* v. *Law,* 3 Cranch 179; *French* v. *Shoemaker,* 12 Wall. 86, 98. In light of this Court's remarks in *United States* v. *E. I. du Pont de Nemours & Co.,* 353 U. S. 586, 607–608, the District Court concluded that the particular form which the divestiture order was to take was a matter which "could have far-reaching effects and consequences," 179 F. Supp., at 741, and that it would be appropriate for the court to conduct hearings on the manner in which the Kinney stock ought to be disposed of by the appellant. Hence it is not farfetched to assume that particular terms of the remedy ordered by the District Court will be contested, and that this Court may well be asked to examine the details relating to the anticipated divestiture. *E. g., United States* v. *E. I. du Pont de Nemours & Co.,* 366 U. S. 316.

The exacting obligation with respect to the terms of antitrust decrees cast upon this Court by the Expediting Act was commented upon only last Term. In *United States* v. *E. I. du Pont de Nemours & Co.,* 366 U. S. 316, it was noted that it was the Court's practice, "particularly in cases of a direct appeal from the decree of a single judge, . . . to examine the District Court's action closely to satisfy ourselves that the relief is effective to redress the antitrust violation proved." 366 U. S., at 323; see *International Boxing Club, Inc.,* v. *United States,* 358 U. S. 242, 253. In the present case the Court and the parties know nothing more of "this most significant phase of the case," *United States* v. *United States Gypsum Co.,* 340 U. S. 76, 89, than that Brown will generally be

required to divest itself of any interest in Kinney. Exactly how this separation is to be accomplished has not yet been determined, and there is no way of knowing now whether both parties to the suit will find the decree satisfactory or whether one or both will seek further review in this Court.

Despite the opportunity thus created for separate reviews of these kinds of cases at their "merits" and "relief" stages, the Court holds that the judgment now in effect has "sufficient indicia of finality" (*ante,* p. 308) to render it appealable now, notwithstanding that the terms of the ordered divestiture have not yet been fixed. This conclusion is based upon three discrete considerations, none of which, in my opinion, serves to overcome the "final judgment" requirement of the Expediting Act, as that term has hitherto been understood in federal law.[1]

*First.* The Court suggests that any further proceedings to be conducted in the District Court are "sufficiently independent of, and subordinate to, the issues presented by this appeal" to permit them to be considered and reviewed separately. But this judicially created exception to the embracing principle of finality has never heretofore been utilized by this Court to permit separate review of a District Court's decision on the underlying merits of a claim when the details of the relief that is to be awarded are yet uncertain. The present case does not present the possibility, as did *Cohen* v. *Beneficial Industrial Loan Corp.,* 337 U. S. 541, and *Forgay* v. *Conrad,* 6 How. 201, that a delay in appellate review would result in irreparable

---

[1] "A final judgment is one which disposes of the whole subject, gives all the relief that was contemplated, provides with reasonable completeness, for giving effect to the judgment and leaves nothing to be done in the cause save to superintend, ministerially, the execution of the decree." *City of Louisa* v. *Levi,* 140 F. 2d 512, 514. See, *e. g., Grant* v. *Phoenix Ins. Co.,* 106 U. S. 429; *Taylor* v. *Board of Education,* 288 F. 2d 600.

harm, equivalent in effect to a denial of any review on the point at issue. See 337 U. S., at 546; 6 How., at 204. Nor is this a case in which the complaint's prayers for relief are so diversified that the resolution of one branch of the case "is independent of, and unaffected by, another litigation with which it happens to be entangled." *Radio Station WOW, Inc.*, v. *Johnson*, 326 U. S. 120, 126; see *Carondelet Canal Co.* v. *Louisiana*, 233 U. S. 362, 372–373; *Forgay* v. *Conrad, supra.*

If the appellant were compelled to await the entry of a particularized divestiture order before being granted appellate review, it would suffer no irremediable loss; indeed, in this case the merger was allowed to proceed *pendente lite,* so any delay, to the extent that it could affect the parties, would benefit the appellant. Nor can it well be suggested that the particular conditions under which the divestiture is to be executed are matters that are only fortuitously "entangled" with the merits of the complaint. Despite the seemingly mandatory tone of the "divestiture" judgment now before us, the plain fact remains that it is *by its own terms* inoperative to a substantial extent until further proceedings are held in the District Court. Unlike the cases relied upon by the Court, therefore, this case comes up on appeal before the appellant knows exactly what it has been ordered to do or not to do. This is surely not the type of judgment "which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin* v. *United States*, 324 U. S. 229, 233; see *Covington* v. *Covington First National Bank*, 185 U. S. 270, 277.

*Second.* The Court finds significant the "character of the decree still to be entered in this suit." *Ante,* p. 309. Since the order of full divestiture requires "careful, and often extended, negotiation and formulation," *ante,* p. 309, it is suggested that a delay in carrying out its terms might render them impractical or unenforceable. Apart

from the fact that this policy consideration is more appropriately addressed to the Congress than to this Court, it appears to me to call for a result directly contrary to that reached by the Court. For if the terms of the divestiture are indeed so difficult to formulate and so interrelated with market conditions, it is most unlikely that the decree to be issued by the District Court will turn out to be satisfactory to both parties. Consequently, on the Court's own reasoning, a second appearance of this case on our docket is not an imaginative possibility but a reasonable likelihood. In stating that the divestiture portion of this judgment "is disputed here on an 'all or nothing' basis," and that "it is ripe for review now, and will, thereafter, be foreclosed," *ante,* p. 309, the Court can hardly mean that either the appellant or the Government will be precluded from seeking review of the divestiture terms if it deems them unsatisfactory. Indeed, neither side on this appeal has addressed itself to the propriety of the divestiture remedy, as such, that is independently of the question whether the merger itself runs afoul of the Clayton Act.

Moreover, if it is delay between formulation of the decree and its execution that is thought to be damaging, what reason is there to believe that this delay or its hazards will be any greater if the entire case is brought up here once than if review is separately sought from the divestiture decree once its terms have been settled? Nor can it be maintained that if the merits are now affirmed then an appeal on the question of relief is improbable. For insofar as complex "negotiation and formulation" is a factor, the probability of an appeal is equally likely in either instance.

*Third.* The Court's final reason for holding this judgment appealable is that similar judgments have often been reviewed here in the past with no issue ever having been raised regarding jurisdiction. But the cases are

legion which have echoed the answer given by Chief Justice Marshall to a contention that the Court was bound on a jurisdictional point by its consideration on the merits of a case in which the jurisdictional question had gone unnoticed: "No question was made, in that case, as to the jurisdiction. It passed *sub silentio,* and the court does not consider itself as bound by that case." *United States* v. *More,* 3 Cranch 159, 172; see *Snow* v. *United States,* 118 U. S. 346, 354; *Cross* v. *Burke,* 146 U. S. 82, 87; *Louisville Trust Co.* v. *Knott,* 191 U. S. 225, 236; *New* v. *Oklahoma,* 195 U. S. 252, 256; *United States ex rel. Arant* v. *Lane,* 245 U. S. 166, 170; *Stainback* v. *Mo Hock Ke Lok Po,* 336 U. S. 368, 379; *United States* v. *L. A. Tucker Truck Lines,* 344 U. S. 33, 38. The fact that the Court may, in the past, have overlooked the lack of finality in some of the judgments that came here for review in similar posture to this one does not now free it from the requirements of the Expediting Act. Nor does the fact that none of the cases reviewed in what now appears to have been an interlocutory stage was ever appealed again justify disregard of the statute. This history might point to the desirability of an amendment to the Expediting Act, but it does not make into a "final judgment" a decree which reserves for future determination the terms of the precise relief to be afforded.

The Court suggests that a "pragmatic approach" to finality is called for in light of the policies of the Federal Rules of Civil Procedure, which direct the "just, speedy, and inexpensive determination of every action." *Ante,* p. 306. But this misconceives the nature of the issue that is presented. Whether this judgment is final and appealable is not a question turning on the Federal Rules of Civil Procedure or on any balance of policies by this Court. Congress has seen fit to make this Court, for reasons which are less than obvious, the sole appellate tribunal for civil antitrust suits instituted by the United

States. In so doing, it has chosen to limit this Court's reviewing power to "final judgments." Whether the first of these legislative determinations, made in 1903, when appeal as of right to this Court was the rule rather than the exception, should survive the expansion in the Court's docket and the development, pursuant to the Judiciary Act of 1925, of this Court's discretionary certiorari jurisdiction, may never have been given adequate consideration by the Congress.[2]

At this period of mounting dockets there is certainly much to be said in favor of relieving this Court of the often arduous task of searching through voluminous trial testimony and exhibits to determine whether a single district judge's findings of fact are supportable. The legal issues in most civil antitrust cases are no longer so novel or unsettled as to make them especially appropriate for initial appellate consideration by this Court, as compared with those in a variety of other areas of federal law. And under modern conditions it may well be doubted whether direct review of such cases by this Court truly serves the purpose of expedition which underlay the original passage of the Expediting Act. I venture to predict that a critical reappraisal of the problem would lead to the conclusion that "expedition" and also, over-all, more satisfactory appellate review would be achieved in

---

[2] For example, the report which accompanied the 1925 Act to the floor of the Senate said of the cases in which direct appeal from a District Court to the Supreme Court was retained: "As is well known, there are certain cases which, under the present law, may be taken directly from the district court to the Supreme Court. Without entering into a description of these four classes of cases, it is sufficient to say that under the existing law *these are cases which must be heard by three judges,* one of whom is a circuit judge." S. Rep. No. 362, 68th Cong., 1st Sess. 3 (1924). (Emphasis added.) This generalization was obviously erroneous since the Expediting Act provided for direct review in this Court of government antitrust cases decided by a single district judge.

these cases were primary appellate jurisdiction returned to the Court of Appeals, leaving this Court free to exercise its certiorari power with respect to particular cases deemed deserving of further review. As things now stand this Court must deal with *all* government civil antitrust cases, often either at the unnecessary expenditure of its own time or at the risk of inadequate appellate review if a summary disposition of the appeal is made. Further, such a jurisdictional change would bid fair to satisfy the very "policy" arguments suggested by the Court in this case. For the Courts of Appeals, whose dockets are generally less crowded than those of this Court, would then be authorized to hear appeals from orders such as the one here in question. Since this order grants an injunction against interlocking interests between Brown and Kinney, it would come within 28 U. S. C. § 1292 (a) (1) were this not a case "where a direct review may be had in the Supreme Court."

So long, however, as the present Expediting Act continues to commend itself to Congress this Court is bound by its limitations, and since for the reasons already given the decree appealed cannot, in my opinion, be properly considered a "final judgment," I think the appeal, at this juncture, should have been dismissed.

## THE MERITS.

Since the Court nonetheless holds that the judgment is appealable in its present form, and since the underlying questions are far-reaching, I consider it a duty to express my view on the merits. On this aspect of the case I join the disposition which affirms the judgment of the District Court, though I am not prepared to subscribe to all that is said or implied in the opinion of this Court.

The question presented by this case can be stated in narrow and concise terms: Are the District Court's conclusions that the effect of the Brown-Kinney merger may

be, in the language of § 7 of the Clayton Act, "substantially to lessen competition, or to tend to create a monopoly" in "any line of commerce in any section of the country" sustainable? In other words, does the indefinite and general language in § 7 manifest a congressional purpose to proscribe a combination of this sort? Brown contends that in finding the merger illegal the District Court lumped together what are in fact discrete "lines of commerce," that it failed to define an appropriate "section of the country," and that when the case is properly viewed any lessening of competition that may be caused by the merger is not "substantial." For reasons stated below, I think that each of these contentions is untenable.

The dispositive considerations are, I think, found in the "vertical" effects of the merger, that is, the effects reasonably to be foreseen from combining Brown's manufacturing facilities with Kinney's retail outlets. In my opinion the District Court's conclusions as to such effects are supported by the record, and suffice to condemn the merger under § 7, without regard to what might be deemed to be the "horizontal" effects of the transaction.

1. *"Line of Commerce."*—In considering both the horizontal and vertical aspects of this merger, the District Court analyzed the probable impact on competition in terms of three relevant "lines of commerce"—men's shoes, women's shoes, and children's shoes. It rejected Brown's claim that shoes of different construction or of different price range constituted distinct lines of commerce. Whatever merit there might be to Brown's contention that the product market should be more narrowly defined when it is viewed from the vantage point of the ultimate consumer (whose pocketbook, for example, may limit his purchase to a definite price range), the same is surely not true of the shoe manufacturer. Although the record contains evidence tending to prove that a shoe manufacturing

plant may be managed more economically if its production is limited to only one type and grade of shoe, the history of Brown's own factories reveals that a single plant may be used in successive years, or even at the same time, for the manufacture of varying grades of shoes and may, without undue difficulty, be shifted from the production of children's shoes to men's or women's shoes, or vice versa.

Because of this flexibility of manufacture, the product market with respect to the merger between Brown's manufacturing facilities and Kinney's retail outlets might more accurately be defined as the complete wearing-apparel shoe market, combining in one the three components which the District Court treated as separate lines of commerce. Such an analysis, taking into account the interchangeability of production, would seem a more realistic gauge of the possible anticompetitive effects in the shoe manufacturing industry of a merger between a shoe manufacturer and a retailer than the District Court's compartmentalization in terms of the buying public. For if a manufacturer of women's shoes is able, albeit at some expense, to convert his plant to the production of men's shoes, the possibility of such a shift should be considered in deciding whether the market for either men's shoes or women's shoes can be monopolized or whether a particular merger substantially lessens competition among manufacturers of either product. See Adelman, Economic Aspects of the Bethlehem Opinion, 45 Va. L. Rev. 684, 689–691; cf. *United States* v. *Columbia Steel Co.*, 334 U. S. 495, 510–511; but see *United States* v. *Bethlehem Steel Corp.*, 168 F. Supp. 576, 592.

The fact that § 7 speaks of the lessening of competition "in *any* line of commerce" (emphasis added) does not, of course, mean that the product market on which the effect of the merger is considered may be defined as narrowly

368

or as broadly as the Government chooses to define it.[3] The duty rests with the District Court, and ultimately with this Court, to determine what is the appropriate market on an appraisal of the relevant economic considerations. Discovering the product market is "a necessary predicate to a finding of a violation of the Clayton Act," *United States* v. *E. I. du Pont de Nemours & Co.*, 353 U. S. 586, 593, and the breadth of the statutory language provides no license for an abdication of this necessary function. In light of the production flexibility demonstrated by the undisputed facts in this case, I think the line of commerce by which the vertical aspects of the Brown-Kinney merger should be judged is the wearing-apparel shoe industry generally.

2. *"Section of the Country."*—This merger involves nationwide concerns which sell and purchase shoes in various localities throughout the country, so that it appears that the most suitable geographical market for appraising the alleged anticompetitive effects of the vertical combination is the Nation as a whole. This finding of the District Court (limited to the vertical aspect of the merger) is not contested by Brown and is properly accepted here. One *caveat* is in order, however. In judging the anticompetitive effect of the merger on the national market, it must be recognized that any decline in competition that might result need not have a uniform effect throughout the entire country. It is sufficient if

---

[3] As the Court noted in *United States* v. *E. I. du Pont de Nemours & Co.*, 351 U. S. 377, 393, "one can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product." If the Government were permitted to choose its "line of commerce" it could presumably draw the market narrowly in a case that turns on the existence *vel non* of monopoly power and draw it broadly when the question is whether both parties to a merger are within the same competitive market.

the record proves that as a result of the merger competition will generally be lessened, though its most serious impact may be felt in certain localities.

3. *"Substantially to Lessen Competition."*—The remaining question is whether the merger of Brown's manufacturing facilities with Kinney's retail outlets "may . . . substantially lessen competition" or "tend to create a monopoly" in the nationwide market in which shoe manufacturers sell to shoe retailers. The findings of the District Court, supported by the evidence, when taken together with undisputed facts appearing in the record, justify the conclusion that a substantial lessening of competition in the relevant market is a "reasonable probability." S. Rep. No. 1775, 81st Cong., 2d Sess. 6 (1950).

On the date of the merger Kinney's retail stores numbered 352, and this figure had increased to more than 400 by the time of the trial. Nearly all these stores sell men's, women's, and children's shoes and are located in the downtown areas of cities of at least 10,000 population. In 116 of these cities, Kinney's combined pairage sale of shoes for 1955 exceeded 10% of all shoes sold in the city during the year. Its total retail shoe sales during the year constituted 1.2% of the national total in terms of dollar volume and 1.6% in terms of pairage. Of these shoes, only 20% were supplied by the Kinney manufacturing plants, the remainder coming from some 197 other sources.[4]

Prior to 1955 Kinney had bought none of its outside-source shoes from Brown, and its records for 1955 reveal that the year's purchases were made from a diverse number of independent shoe manufacturers. There were 66 suppliers (including Brown) in that year each of whose total sales to Kinney exceeded $50,000, and only three of

---

[4] The schedule in the record of Kinney's outside shoe suppliers for the calendar year 1955 lists 319 vendors, but 122 of these supplied less than $1,000 worth of goods during the year.

these (Brown, Endicott-Johnson Co., and Georgia Shoe Manufacturing Co.) were large companies whose output placed them among the 25 most productive nonrubber shoe manufacturers in the United States. Consequently, it appears that Kinney was a substantial purchaser of the shoes produced by many small independent shoe manufacturers throughout the country. In fact, the record affirmatively shows that at least five of Kinney's suppliers, three of which are located in the State of New York, one in Pennsylvania, and one in New Hampshire, each relied upon Kinney to purchase more than 40% of its total production in 1955.

That the merger between Brown's shoe production plants and Kinney's retail outlets will tend to foreclose some of the large market which smaller shoe manufacturers found in sales to Kinney hardly seems open to doubt. This conclusion is supported by the following facts which emerge indisputably from the record: (1) In the shoe industry, as in many others, the purchase of a retail chain by a manufacturer results in an increased flow of the purchasing manufacturer's shoes to the retail store. Hence independent shoe manufacturers find it more difficult to sell their shoes to an acquired retail chain than to an independent one. (2) The result of Brown's earlier acquisition of two retail chains was, in each instance, a substantial increase in the quantity of Brown shoe purchases by the previously independent chains.[5]

---

[5] In 1951 Brown purchased the Wohl Shoe Company, which operated leased shoe departments in department stores throughout the country. Before its acquisition of Wohl, Brown had supplied 12.8% of Wohl's shoe requirements; by 1957, it was supplying 33.6% of Wohl's needs.

In 1953, Brown purchased a partial interest in a small chain of retail stores in Los Angeles known as Wetherby-Kayser. Before this purchase, Brown had supplied 10.4% of Wetherby's shoes; within one year this percentage increased to almost 50%.

(3) The history of many of Brown's plants proves that they may be readily adapted to the production of the grade and style of shoes customarily sold in Kinney stores.[6] (4) Although Brown supplied none of Kinney's requirements before the merger, it was supplying almost 8% of these requirements just two years thereafter.

The dollar volume of Kinney's outside shoe purchases in 1955 was between 16 and 17 million dollars, and this amount had increased to 19.4 million by 1957. While Kinney was making only about 1.2% of the total retail dollar sales in the United States in 1955, that percentage can hardly be deemed an accurate reflection of its proportion of nationwide shoe *purchases* by retailers since the retail-sales figure is based on a computation that includes *all* retail stores, whether or not they were vertically integrated or otherwise affiliated. In terms of available markets for independent shoe manufacturers, the percentage of Kinney's purchases must have been substantially larger—though the precise figure is unavailable on the record before us.[7]

If the controlling test were, as it may be under the similar language of § 3 of the Clayton Act, one of "quanti-

---

[6] In addition, it appears from the record that shortly after the merger was effected, Kinney abandoned its earlier policy of selling only Kinney-brand shoes (80% of which were "made up" for it by its manufacturers) and began selling a considerable number of Brown's branded and advertised shoes. Along with the indications in the record that Kinney was beginning also to sell higher-priced shoes in its suburban outlets, this suggests that Brown could supply much of Kinney's needs with only a minimal additional capital investment.

[7] The existence of such gaps in the record make a fair assessment of the effects of this merger more difficult than it would otherwise be. One of the reasons why I would not consider the horizontal aspect of this merger is my conviction that the data supplied by the Government is entirely inadequate for a proper evaluation of the impact of the horizontal merger on competition.

tative substantiality," compare *Standard Oil Co.* v. *United States,* 337 U. S. 293, with *Tampa Electric Co.* v. *Nashville Coal Co.,* 365 U. S. 320, the probable foreclosure of independent manufacturers from this substantial share of the available retail shoe market would be enough to render the vertical aspect of this merger unlawful under § 7. But since the merger can be shown to have an injurious effect on competition among manufacturers and among retailers, it is unnecessary to consider whether the *Standard Stations* formula is applicable.

The vertical affiliation between this shoe manufacturer and a primarily retail organization is surely not, as the dissenters thought the contractual tie in *Standard Stations* to be, "a device for waging competition" rather than "a device for suppressing competition." 337 U. S., at 323. Since Brown is able by reason of this merger to turn an independent purchaser into a captive market for its shoes it inevitably diminishes the available market for which shoe manufacturers compete. If Brown shoes replace those which had been previously produced by others, the displaced manufacturers have no choice but to enter some other market or go out of business. Since all manufacturers, including Brown, had competed for Kinney's patronage when it was unaffiliated, Brown's merger with Kinney potentially withdraws a share of the market previously available to the independent shoe manufacturers.

Not only may this merger, judged from a vertical standpoint, affect manufacturers who compete with Brown; it may also adversely affect competition on the retailing level. With a large manufacturer such as Brown behind it, the Kinney chain would have a great competitive advantage over the retail stores with which it vies for consumer patronage. As a manufacturer-owned outlet, the Kinney store would doubtless be able to sell its shoes at a

lower profit margin and outlast an independent competitor. The merger would also effectively prevent the retail competitor from dealing in Brown shoes, since these might be offered at lower prices in Kinney stores than elsewhere.[8]

Brown contends that even if these anticompetitive effects are probable, they touch upon an insignificant share of the market and are not, therefore, "substantial" within the meaning of § 7. Our decision in *Tampa Electric Co.* v. *Nashville Coal Co.*, 365 U. S. 320, is cited as authority for the proposition that a foreclosure of about 1% of the relevant market is necessarily insubstantial. But the opinion in *Tampa Electric* carefully noted that "substantiality in a given case" depends on a variety of factors. 365 U. S., at 329. Two of the considerations that were mentioned were "the relative strength of the parties" and "the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein." *Ibid.* When, as here, the foreclosure of what may be considered a small percentage of retailers' purchases may be caused by the combination of the country's third largest seller of shoes with the country's largest family-style shoe store chain, and when the volume of the latter's purchases from independent manufacturers in various parts of the country is large enough to render it probable that these suppliers, if displaced, will have to fall by the wayside, it cannot, in my opinion, be said that the effect on the shoe industry is "remote" or "insubstantial."

I reach this result without considering the findings of the District Court respecting the trend in the shoe industry towards "oligopoly" and vertical integration. The

---

[8] The change in Kinney policy whereby it now carries shoes bearing the Brown brand (see note 6, *supra*) tends to make retailer competition still more difficult.

statistics in the record fall short of convincing me that any such trend exists.[9] I consider the District Court's judgment warranted apart from these findings.

Accordingly, bowing to the Court's decision that the case is properly before us, I join the judgment of affirmance.

---

[9] In terms of bare numbers, the quantity of retail outlets owned or controlled by the major manufacturers has undoubtedly been increasing since 1947. But much of the data in the record is incomplete in this regard because it is based on varying standards. Thus, while the Government argues that the increase in percentage of national retail sales by shoe chains owning 101 or more outlets from 20.9% in 1948 to 25.5% in 1954 proves the trend toward "oligopoly," the appellant's statistics, founded upon retail sales by *all* outlets (including general merchandise and clothing stores), show that retail sales by chains of 11 or more stood at a constant 19.5% of national dollar volume in both 1948 and 1954. Moreover, the apparent decline in the proportional share of the country's shoe needs supplied by the largest manufacturers between 1947 and 1955 belies any claim that shoe production is becoming "oligopolistic." Whereas the largest four manufacturers supplied 25.9% of the Nation's needs in 1947, the largest eight supplied 31.4%, and the largest 15 supplied 36.2%, in 1955 the equivalent percentages were 22%, 27%, and 32.5%.

There is no suggestion in the record as to whether earlier purchases of retail chains by shoe manufacturers reduced the number of independent manufacturers or otherwise harmed competition. Consequently, while the record does establish that manufacturers have been increasing the number of their retail outlets, it is entirely silent on the effects of this vertical expansion.